[No. D047681. Fourth Dist., Div. One. June 22, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
THEODORE E. MILLARD, Defendant and Appellant.

[No. D049268. Fourth Dist., Div. One. June 22, 2009.]

THE PEOPLE, Plaintiff and Appellant, v.
THEODORE E. MILLARD, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I, II, III and IV.

8

12

COUNSEL

Law Office of William J. Kopeny & Associates and William J. Kopeny for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, James D. Dutton and Melissa Mandel, Deputy Attorneys General, for Plaintiff and Respondent and for Plaintiff and Appellant.

**O**PINION

**McDONALD, J.**—Theodore E. Millard appeals a judgment following his jury conviction of driving under the influence while committing an act forbidden by law and causing bodily injury to another person (Veh. Code, § 23153, subd. (a)). He also appeals a postjudgment order awarding $386,164 in restitution to the victim (Pen. Code, § 1202.4). On appeal, he contends his conviction must be reversed because (1) the trial court erred in instructing on causation of the victim's injuries; (2) he was denied his constitutional rights to a fair trial and to present a defense when the trial court (a) excluded evidence he was not under the influence of alcohol at the time of the incident, and (b) did not instruct on the Vehicle Code section 23610, subdivision (a)(1), presumption; (3) the trial court erred by denying his motion for new trial; and (4) he was denied his right to due process of law because certain material exculpatory evidence was destroyed or lost. He contends the restitution order must be reversed because (1) the trial court erred by awarding the victim unreasonable attorney fees; (2) the trial court erred by awarding the victim $750,000 in future lost wages; and (3) his constitutional right to findings by a jury beyond a reasonable doubt was violated by the court's findings by a preponderance of the evidence at the restitution hearing.

The People appeal the trial court's restitution order, contending the trial court (1) erred by reducing the amount of restitution by 25 percent because of the victim's comparative negligence; (2) abused its discretion by reducing the amount of restitution because it disagreed with the law; (3) made findings regarding the victim's negligence without sufficient supporting evidence; (4) erred by valuing the victim's medical expenses based on the amount paid by the victim's insurance company rather than the amount billed by the medical providers; and (5) applied two different ratios in apportioning the victim's settlement proceeds between economic and noneconomic losses.

In the published portion of this opinion, we conclude a trial court may apply the doctrine of comparative negligence in awarding victim restitution against a criminally negligent defendant when the court finds the victim's contributory negligence was a substantial factor in causing his or her injuries.

FACTUAL AND PROCEDURAL BACKGROUND

At 10:11 p.m. on December 5, 2003, Billy Frank Payne was driving his motorcycle northbound on Tustin in Orange County. He had regularly driven

his motorcycle for two years and it was in excellent condition and well maintained. Its headlight, taillights, and turn indicators were all working properly. He was wearing a helmet with a clear face shield. He had never owned a helmet with a tinted face shield, because it would impair his vision at night. He had not been drinking or using drugs. His motorcycle's speedometer was illuminated. He monitored his speed as he drove. He was going 40 miles per hour.

Payne maintained that speed as he passed through the intersection of Tustin and Fairhaven on a green light. He was in the number one lane, the lane closest to the center of the multilane street. There were no vehicles in front of him going northbound. He saw two vehicles traveling southbound (in the opposite direction) in front of him. The first vehicle passed him without incident. However, the second vehicle suddenly veered directly toward him in the northbound number one lane. That second vehicle was a Ford Explorer driven by Millard, traveling about 40 miles per hour without its turn indicator flashing. Payne had only about one second to react. He engaged his brakes, turned his wheel to the right, and then was struck by Millard's vehicle, which was traveling directly south in the northbound number one lane and did not stop at any time prior to the impact. Payne first felt the impact below his left knee, and his femur shattered. His body struck the center of the hood of Millard's vehicle. Payne blacked out. When he regained consciousness, he was lying on the street and had difficulty breathing. He could not use his left hand when he tried to lift his face shield. A person standing over him told him help was on the way. He was later taken to a hospital by paramedics.

Marco Mondragon, an employee of a gas station located on the corner of Tustin and Fairhaven, heard screeching tires and saw a white Explorer stopped, facing directly south in the northbound number one lane. A motorcycle, totally damaged, was lying on the street directly in front of the Explorer. The hood and front fender of the Explorer were damaged. Mondragon saw a person lying on the ground and told his coworker to call 911. Mondragon then went back outside. The driver of the Explorer (Millard) never got out of his vehicle. Millard backed up his vehicle, drove it to the gas station, and stopped at pump number one. Millard went into the station's store and asked for the restroom key so he could wash his face. Returning from the restroom, he asked for hot coffee. Because the store did not have any hot coffee, Millard bought a bottle of cold coffee and went back outside to his vehicle. Millard did not go to the area where the motorcyclist (Payne) was lying on the street.

City of Orange Police Officer John Mancini was the first officer to arrive at the scene. He saw a motorcyclist lying in the street with about 20 people in the area. Although the bystanders had not seen the accident, they pointed out

a white Ford Explorer parked at the gas station. Millard and his wife, Sondra, were standing outside the Explorer. The Explorer had damage to its front bumper, grill, and the center of its hood. Speaking with Millard, Mancini noticed that he smelled of alcohol, had slow speech, and an unsteady gait. Millard's eyes were bloodshot and watery. Millard admitted he had consumed alcohol. Millard stated he was making a left turn into the gas station and was traveling about 10 miles per hour at the time of the collision. Millard told Mancini that he had not seen the motorcycle. Mancini called Officer Martin Suarez, who arrived a few minutes later.

As Suarez spoke with Millard, he noticed his eyes were watery and his posture was sagging, indications he was possibly under the influence of alcohol. Suarez administered a horizontal gaze nystagmus test, which suggested Millard may have had alcohol in his body. Millard told Suarez he had consumed three to four glasses of wine, with about two to three inches of wine in each glass, at the home of some friends. Suarez concluded Millard was impaired for purposes of driving and placed him under arrest for driving under the influence of alcohol. Suarez advised Millard of his obligation to provide a sample of blood, breath, or urine for chemical analysis. Millard agreed to provide a blood sample. At 11:42 p.m., Millard's blood sample was drawn. Two subsequent chemical analyses of that sample showed his blood-alcohol content was 0.110 and 0.112 percent.

An information charged Millard with one count of driving under the influence while committing an act forbidden by law and causing bodily injury to another person (Veh. Code, § 23153, subd. (a)) and one count of driving with a blood-alcohol content of 0.08 percent or greater while committing an act forbidden by law and causing bodily injury to another person (Veh. Code, § 23153, subd. (b)). Each count alleged that in commission of the offense Millard unlawfully failed to yield to another vehicle with the right-of-way as he turned left (Veh. Code, § 21801). The information also alleged that in committing each offense Millard personally inflicted great bodily injury on Payne (Pen. Code, § 12022.7, subd. (a)).

During Millard's jury trial, Payne, Mondragon, Mancini and Suarez testified as described above. The prosecution also presented the testimonies of traffic investigators and reconstruction experts who concluded Millard was at fault in the collision. Mancini concluded the point of impact was in the northbound number one lane of Tustin, 25 feet west of the east curb line of Tustin and 163 feet north of the north curb line of Fairhaven. There were no vehicle defects, weather conditions, or lighting conditions that contributed to the collision. He was unable to determine the motorcycle's speed at the time of the accident. Mancini testified that a driver of a vehicle traveling southbound on Tustin was required to yield to an oncoming motorcycle traveling

northbound before turning left across the northbound lanes. The motorcycle had the right-of-way. Furthermore, the driver of the Explorer was required to anticipate that oncoming vehicles may change lanes and be speeding.

Accident reconstructionist Ernest Phillips reviewed materials and conducted his own investigation of the accident scene. He concluded the motorcycle was sliding on its left side immediately before impact. The Explorer was traveling southbound in the northbound number one lane. The impact occurred between the number one and number two lanes. Payne's testimony that he tried to make a hard right turn to avoid the collision was consistent with the fact that his motorcycle slid onto its left side because of the dynamic of countersteering. Assuming the motorcycle was traveling 40 miles per hour, it would have traveled about 60 feet per second. Therefore, at a distance of 900 feet the motorcycle would have been visible for at least 15 seconds. Assuming the motorcycle was traveling 60 miles per hour, it would have traveled about 90 feet per second and been visible for 10 seconds. The impact occurred 25 feet north of the driveway into the gas station, meaning Millard entered the northbound lane more than 25 feet north of the driveway into which he stated he was turning. A typical turn into the gas station would be made at its driveway entrance. The evidence showed it was a head-on collision and Millard was not traveling east in a left turn toward the gas station. At the time of the collision, the motorcycle was traveling about 40 miles per hour and the Explorer was traveling about five to 10 miles per hour. In Phillips's opinion, the Explorer clearly violated the motorcycle's right-of-way even if Payne was wearing a dark face shield and traveling at 60 miles per hour, because the Explorer could not legally enter the motorcycle's lane until it was safe to do so.

Officer Kenneth Adams testified that on January 7, 2004, he inspected the motorcycle at the tow yard. Its headlight was operable. The motorcycle was in third gear, which is typically used to travel 35 to 45 miles per hour. Officer Brent Taylor examined the headlight and determined that its low beam was illuminated at the time of impact.

Forensic alcohol expert Felicia Gardner concluded that a hypothetical person of Millard's weight, who ate and drank at the times Millard stated and whose blood-alcohol content was 0.11 percent at 11:47 p.m., would have had a blood-alcohol level of about 0.13 percent at the time of collision, assuming all of the alcohol he drank was fully absorbed before that time. However, if he had a drink within one-half hour before the collision and that drink had not yet been absorbed into his blood system, his blood-alcohol content would have been 0.11 percent at the time of the collision, because the maximum that drink could have contributed was an additional 0.017 percent. A person who consumed about six and one-half to seven drinks would have about 26 to 30

ounces of wine in his or her system, but would have also burned off about 12 ounces of wine. Considering a hypothetical person with Millard's objective symptoms, his driving, his performance on the field tests, and his blood-alcohol content, Gardner concluded that person would be under the influence of alcohol for purposes of driving.

Payne suffered multiple injuries, including a shattered femur, fractured left forearm, fractured right wrist, fractured sternum, torn ligaments, dislocated wristbone, concussion, lacerations, and bruises. He was hospitalized for one month and had multiple surgeries to treat his injuries.

In Millard's defense, Millard, Sondra, and their friend, Denita Gilman, testified that he, Sondra, and their granddaughter went to the Gilmans' home for dinner on December 5, 2003. They arrived between 6:00 p.m. and 6:30 p.m. They brought wine and the Gilmans served their own wine. The group drank wine and ate hors d'oeuvres until dinner, which began about 8:00 p.m. Dinner consisted of steak, potatoes, salad, garlic bread, and chocolate cake. They also drank wine during dinner. Millard was the only person drinking from the bottle of red wine that he brought. When the Millards left about 10:00 p.m., there were about one or two inches of wine left in that bottle.

Millard testified that his first glass of wine contained about six and one-half ounces, which he drank over a period of one to two hours while socializing and eating. He began drinking a second glass of wine with about the same amount about 7:35 p.m. or 7:40 p.m. and finished it between 8:30 p.m. and 8:45 p.m. He began drinking a third glass of wine with about five and one-half ounces during dinner and finished its last four and one-half ounces a couple of minutes before leaving the Gilmans' house. Millard testified that he did not feel under the influence of alcohol at the time he left.[1]

After leaving the Gilmans' house, the Millards dropped off their grand-daughter a few blocks away and then decided to buy gas on their way home. Millard, driving south on Tustin, pulled into the left turn lane and stopped, waiting for traffic to pass. He then began his turn and entered the northbound number one lane going about five to 10 miles per hour, but immediately stopped when he heard Sondra scream, "Honey!" Millard saw a motorcycle approaching at a speed of about 60 miles per hour. Millard testified that he tried to make eye contact with the motorcycle's driver, but could not do so because the driver was wearing a dark face shield. Millard saw the motor-cycle for about two and one-half to three seconds before it crashed into the front of his vehicle. The motorcycle did not appear to slow down or take any

---

[1] Sondra and Gilman also testified they did not notice any symptoms that Millard was under the influence of alcohol.

evasive action. After the collision, Sondra called 911 and people immediately came running from the gas station to the scene. Millard drove his vehicle to the gas station and used its restroom.

Millard testified that his difficulty in performing the field sobriety tests was because of his age and knee and back problems. He denied telling Officer Suarez that he never saw the motorcycle. He testified that he told Suarez he saw the motorcycle approaching at a high rate of speed after he started his turn and that the motorcycle's driver was wearing a dark face shield.

William Otto, an accident reconstruction expert, testified Payne's body hit Millard's Explorer at a speed of about 38 miles per hour. Based on scuff marks and abrasions on the motorcycle's tires, he concluded the brakes were engaged before the accident and the motorcycle leaned to the left 20 to 30 degrees in a locked wheel skid that lasted about one and one-half seconds. He testified that braking would have left skid marks on the pavement. However, neither the police reports nor witness accounts that he reviewed disclosed any skid marks at the scene. He estimated the motorcycle was traveling 60 miles per hour prior to braking. However, if the motorcycle was traveling 40 miles per hour and did not brake prior to the collision, Payne's body would have hit the Explorer at his estimate of about 38 miles per hour. Traveling at 60 miles per hour, it would have taken the motorcycle 3.4 seconds to travel 300 feet. If the Explorer was traveling about 10 miles per hour, it would have taken about three seconds to travel the 45-foot distance from the left turn lane to the gas station's driveway. The motorcycle's headlight would have been visible for about 10 seconds prior to the collision, even were the motorcycle traveling at 60 miles per hour.

Fire Captain Dale Eggleston testified he believed the face shield of Payne's helmet was clear because when he arrived at the scene he could see Payne's face and glasses.

Kenneth Obenski, a forensic engineer in accident reconstruction, testified that motorcycles are difficult for motorists to see. When he examined the accident scene on December 11, 2003, he did not see any skid marks. Also, none of the photographs he reviewed showed any skid marks. He acknowledged the police report specifically stated there were no skid marks. He testified that because a fuse for the motorcycle was blown, its taillight and speedometer were not illuminated. Obenski estimated the motorcycle was traveling 38 miles per hour at the time of the collision. Based on scrape marks and abrasions on the motorcycle's front tire, he concluded the motorcycle was traveling 59 miles per hour when it was 280 feet from impact and then braked and left skid marks. The posted speed limit was 40 miles per hour. He admitted his speed calculation was dependent on his assumption that

the motorcycle had braked prior to the collision. If the motorcycle was traveling 40 miles per hour and did not brake before impact, its speed on impact would have been about 38 miles per hour. Although its headlight would have been visible for a long distance, it would have to have been within 150 to 200 feet for a driver to determine it was a motorcycle. At the time Millard began his turn, the motorcycle was at least 280 feet away and would not have been discernible as a motorcycle. Obenski testified it was reasonable for Millard to begin his turn because there was no hazard at that time.

Darrell Clardy, a forensic alcohol expert, testified he received a sample of Millard's blood drawn on December 5, 2003. Clardy's tests of the sample showed blood-alcohol contents of 0.101 and 0.097 percent. Clardy also conducted a replication study at his laboratory during which Millard consumed the approximate amount of food and alcohol during a similar timeframe as on December 5. Based on his study, Clardy concluded Millard's blood-alcohol content at the time of the accident would have been between 0.04 and 0.047 percent. Those levels were lower than results of the tests of Millard's December 5 blood samples because he was continuing to absorb alcohol into his system after the accident.

The jury found Millard guilty of driving under the influence while committing an act forbidden by law and causing bodily injury to another person (Veh. Code, § 23153, subd. (a)) and found true the allegation that in committing that offense Millard personally inflicted great bodily injury on Payne (Pen. Code, § 12022.7, subd. (a)). The jury found Millard not guilty of driving with a blood-alcohol content of 0.08 percent or greater while committing an act forbidden by law and causing bodily injury to another person (Veh. Code, § 23153, subd. (b)).

On July 25, 2005, the trial court denied Millard's motion for a new trial and granted him three years of informal probation on the condition that he serve 75 days in local custody and five and one-half months of electronic confinement.

On May 10 and June 26, 2006, restitution hearings were conducted. On June 30, the trial court issued its written ruling ordering Millard to pay Payne a total of $386,164 in victim restitution pursuant to Penal Code section 1202.4.[2]

---

[2] The restitution hearings and the trial court's restitution order are described below.

Millard timely filed a notice of appeal challenging the judgment and restitution order. The People timely filed a notice of appeal challenging the restitution order.[3]

## DISCUSSION

### I–IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### V

### *Victim Restitution*

Both Millard and the People appeal the trial court's order awarding Payne $386,164 in victim restitution pursuant to Penal Code section 1202.4. Because many of their arguments deal with the same issues, we address their contentions together.

### A

At the postsentencing restitution hearings on May 10 and June 26, 2006, Payne testified regarding the major injuries he sustained in the accident. Through June 2004, his medical bills totaled $297,313.22, but his insurance company negotiated a settlement of those bills for, and paid, $110,256.69. He underwent two additional surgeries after June 2004, for which he was billed $45,000 and $75,000, respectively. He also paid $150 per month for chiropractic services.

Since the accident, Payne had been unable to work as a customer service representative for a new home construction company, a position that required considerable physical activity. He now uses a cane and limps when he walks. His leg, knee, and wrist injuries cause him pain and preclude him from climbing stairs, stooping, bending, and standing up. He has permanent nerve

---

[3] On November 3, 2006, we issued an order granting the parties' joint request to consolidate their appeals (i.e., case Nos. D047681 and D049268). On April 9, 2009, the People filed a request that we take judicial notice of a civil action filed by Millard against Payne on January 22, 2009, in the Orange County Superior Court. We now grant the People's request for judicial notice of that complaint filed by Millard. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).) However, we do not consider that complaint in disposing of the instant appeals because it is irrelevant to the issues on appeal.

*See footnote, *ante*, page 7.

damage. On the day of the accident, Payne was 52 years old and earning $50,000 per year plus benefits. Payne does not believe he will ever be able to return to his job.

Payne entered into a settlement agreement with Millard's insurance company for $1,100,000. He stated that amount did not fully compensate him for his damages. Pursuant to the contingency fee agreement he entered into with Black (his attorney), Black received one-third of the settlement proceeds.

Black testified that he had valued Payne's civil action against Millard at about $3.5 million. In making that valuation, he considered Payne's past and future medical expenses and lost earnings. His contingency agreement, which he stated was the standard for the legal community, was for one-third of settlement proceeds if the case was settled before filing a lawsuit and 40 percent of any proceeds received if a lawsuit was filed. At the time, because he did not know whether Millard had a minimum limit insurance policy, Black agreed to charge Payne only $200 per hour if a minimum policy was involved. After settling Payne's claims against Millard, Black received $366,666.67 in attorney fees. He also received an additional $1,800 as reimbursement for his costs. Black estimated he spent about 200 hours on Payne's case prior to settlement and an additional 200 hours after settlement. However, because it was a contingency case, he did not keep records of the hours he spent on the case and could not accurately reconstruct the time he worked on the case.

Attorney Christopher Day testified on behalf of Millard. Day valued Payne's economic damages at about $200,000 and would have expected a verdict in the range of $800,000 to $900,000. Day concluded Payne was 50 to 60 percent contributorily negligent and reduced his valuation of Payne's case by that amount. Day stated Black had spent fewer than 100 hours on Payne's case. He believed Black's $366,666 in attorney fees was not reasonable. When Day performs only limited work on a contingency fee case, he reduces the amount charged to his client. Day believed Payne had residual earning capacity.

Attorney Michael Maguire, a lawyer for Millard's insurer (State Farm Insurance Company), testified the $1,100,000 settlement amount was more than Payne's case was worth. He stated the settlement amount included Payne's attorney fees. Maguire valued Payne's case at between $600,000 and $750,000. Maguire stated Payne was at least 50 percent responsible for the accident. He estimated Black spent fewer than 100 hours on the case before settlement. He stated a reasonable fee for Black's services, consisting of between 100 and 200 hours of work, would be $20,000 to $40,000.

On June 30, 2006, the trial court issued its written order on victim restitution. Regarding reimbursement of Payne's medical expenses, the court found medical providers had billed him a total of $418,081, but his insurance company had actually paid a total of $133,286 for that billed amount. Citing *Nishihama v. City and County of San Francisco* (2001) 93 Cal.App.4th 298 [112 Cal.Rptr.2d 861], the court rejected the People's request that Payne be awarded the total billed amount. Instead, the court awarded only the total amount actually paid to his medical providers in the amount of "$133,256" (*sic*).

Regarding reimbursement for Payne's lost earnings, the trial court rejected Millard's argument that Payne would be able to go back to work, stating: "[T]he court has observed Mr. Payne throughout the trial and these proceedings. He is a severely injured man. The court finds that [his] statement 'I will go back to work' is a statement of hope and not of fact. He may well go back to work, in fact the court hopes that he does, but at this time it is conjectural at best." The court awarded Payne $50,000 for past lost earnings and $750,000 for future lost earnings, a total of $800,000 in lost income.

Regarding reimbursement for Payne's attorney fees, the trial court found his contingency fee agreement with Black provided for a one-third contingency fee, pursuant to which Black collected $366,666 out of the $1,100,000 settlement amount. The court further found:

"Mr. Black testified that he had between 100 and 200 hours in the case when it settled. Giving the benefit of the doubt to him, that is [an] average hourly rate of [$] 1833.33 for some letter writing. There was little skill or expertise involved in the matter. The court finds that the contingent fee of $366,666 is unconscionable under the facts and circumstances of this case. There is uncontradicted evidence that when such a huge amount of money is recovered with little or no effort on the part of the attorney that the practice is [to] remit part of one's fee. [¶] The rules on professional conduct support this idea. [¶] Amount of fee in proportion to services: $366,666 divided by 200 hours gives an hourly rate of $1833[,] which is extraordinary to say the least. . . . [¶] Novelty and difficulty of questions presented. None. Illegal left turn into oncoming traffic. [¶] This case was a slam dunk from the tort liability side of the equation. The court notes that the victim was still within the throes of his accident when the case was signed up and settled. As Mr. Day testified, Mr. Payne could have obtained $1,100,000 on the facts of this case.

"But having said all of that, the court does not believe that it has the right or jurisdiction to interfere with the contingent fee arrangement between the victim and his counsel. [¶] The court understands that it should only approve

reasonable attorneys fees but then the victim suffers the loss. That is inherently unfair as between the two parties.

"Analysis of Recoverable Portion of the Fee[.] [¶] But the economic damages in this case are the $133,256 [*sic*] in medical expenses plus $800,000 in lost earnings and $600 in chiropractic [expenses] for a total of $933,856. [¶] The total settlement was $1,100,000. The balance must of necessity be for pain and suffering. This number is $166,144[,] which is 15.1% of the total. 15.1% of $366,666 is $55,366. The net of attorney's fees attributable to economic damages is $311,300. [¶] [**Ruling**]: Attorneys fees are awarded of $311,300."

The trial court then added the amounts of Payne's economic losses for medical expenses ("$133,256" [*sic*]), lost earnings ($800,000), chiropractic services ($600), and attorney fees ($311,300), for a total amount of economic losses of $1,245,126.[9]

The court then addressed the amount to be credited to Millard toward the $1,245,126 amount for the portion of the settlement amount that should be apportioned to Payne's economic losses. The court stated: "The court believes that the fairest way to apportion the settlement proceeds is to determine an approximate verdict and divide the restitution economic damages by that number. Any other method would appear to be arbitrary. The settlement was based on available insurance proceeds so it was driven by the policies. There has been a lot of testimony about the verdict value of this case. It ranged from $800,000 to $4,000,000. This court has settled many cases and been involved in trials of many cases. There is no exact science in setting a value for a case and the court recognized that it can and will be second guessed. Be that as it may[,] recognizing that this was a motorcycle accident late at night[,] the court finds that a reasonable verdict would be in the $2,500,000 range. It could be higher and it could be lower. This is the mid[-]range." The court then divided Payne's total economic losses ($1,245,126) by the total estimated value of Payne's case ($2,500,000), obtaining a ratio of 49.8 percent for his economic damages as a portion of total damages. Multiplying that 49.8 percent ratio by the total amount of the settlement ($1,100,000), the court obtained an amount of $547,800 of the settlement proceeds that should be apportioned to Payne's economic losses. Crediting that $547,800 amount already paid to Payne for his economic losses against his total economic losses of $1,245,126, the court concluded that Payne's unpaid economic losses were $697,326.

---

[9] Although the court's order calculated the total amount as $1,245,126, the correct total is $1,245,156. Nevertheless, because the difference is negligible (i.e., $30) and we remand the matter on another ground as discussed below, we need not correct the trial court's error in summation for purposes of this appeal.

The trial court then addressed Millard's claim that the doctrine of comparative fault should be applied to reduce the amount of reimbursement for Payne's economic losses in proportion to his comparative or contributory fault in causing the accident. Noting that this was a "negligence[-]type crime," the court was unable to find any cases on point. Nevertheless, citing *Sommers v. Erb* (1992) 2 Cal.App.4th 1644 [4 Cal.Rptr.2d 52] (*Sommers*), the trial court noted the court in *Sommers* addressed a similar statute (i.e., Code Civ. Proc., § 1021.4) and concluded a victim's fault was one of the factors to be considered by the trial court in awarding attorney fees. The trial court in this case weighed the evidence at trial and concluded Payne was negligent and 25 percent comparatively at fault for the accident. Citing justice and fairness, the court concluded Payne's restitution amount should be reduced by 25 percent to reflect his comparative negligence in causing the accident.

Multiplying Payne's total economic losses of "$1,254,286" (*sic*) by Millard's 75 percent comparative fault (in effect imposing partial responsibility on Payne for his 25 percent comparative fault), the court concluded Millard was responsible for $933,964 of Payne's economic losses. (75 percent of $1,245,126 is actually $933,844.50.) The court then credited Millard with the $547,800 portion of the settlement proceeds his insurance company had already paid toward Payne's economic losses, and concluded Millard still owed Payne $386,164 in victim restitution for his economic losses. Accordingly, the court awarded Payne $386,164 in victim restitution under Penal Code section 1202.4, along with 10 percent interest accruing thereafter pursuant to Penal Code section 1202.4, subdivision (f)(3)(G).

## B

■ "In 1982, California voters passed Proposition 8, also known as The Victims' Bill of Rights . . . . Proposition 8 established the right of crime victims to receive restitution directly 'from the persons convicted of the crimes for losses they suffer.' (Cal. Const., art. I, § 28, subd. (b).)" (*People v. Giordano* (2007) 42 Cal.4th 644, 652 [68 Cal.Rptr.3d 51, 170 P.3d 623].) At the time of the judgment in this case in 2006, article I, section 28, subdivision (b), of the California Constitution provided: "It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to restitution from the persons convicted of the crimes for losses they suffer. [¶] Restitution shall be ordered from the convicted persons in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss, unless compelling and extraordinary reasons exist to the contrary."

In implementing Proposition 8, the Legislature enacted Penal Code section 1202.4, which provides:

"(a)(1) It is the intent of the Legislature that a victim of crime who incurs any economic loss as a result of the commission of a crime shall receive restitution directly from any defendant convicted of that crime. [¶] . . . [¶]

"(3) The court, in addition to any other penalty provided or imposed under the law, shall order the defendant to pay . . . the following: [¶] . . . [¶] (B) Restitution to the victim or victims, if any, in accordance with subdivision (f), which shall be enforceable as if the order were a civil judgment. [¶] . . . [¶]

"(f) . . . [I]n every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court. If the amount of loss cannot be ascertained at the time of sentencing, the restitution order shall include a provision that the amount shall be determined at the direction of the court. The court shall order full restitution unless it finds compelling and extraordinary reasons for not doing so, and states them on the record. . . .

"(1) The defendant has the right to a hearing before a judge to dispute the determination of the amount of restitution. . . .

"(2) Determination of the amount of restitution ordered pursuant to this subdivision shall not be affected by the indemnification or subrogation rights of any third party. . . .

"(3) To the extent possible, the restitution order shall be prepared by the sentencing court, shall identify each victim and each loss to which it pertains, and shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct, including, but not limited to, all of the following: [¶] . . . [¶]

"(B) Medical expenses. [¶] . . . [¶]

"(D) Wages or profits lost due to injury incurred by the victim . . . . [¶] . . . [¶]

"(H) Actual and reasonable attorney's fees and other costs of collection accrued by a private entity on behalf of the victim. [¶] . . . [¶]

 "(g) The court shall order full restitution unless it finds compelling and extraordinary reasons for not doing so, and states those reasons on the

record." Penal Code section 1202.4 provides for full restitution of victims' *economic* losses, but "does not authorize direct restitution for noneconomic losses. [Citation.]" (*People v. Giordano, supra*, 42 Cal.4th at p. 656.) "[D]irect victims of crime have a statutory right to restitution on the full amount of their losses without regard to the full or partial recoupment from other sources (except the state Restitution Fund). [Citations.]" (*People v. Baker* (2005) 126 Cal.App.4th 463, 468 [23 Cal.Rptr.3d 871].)

■ At a victim restitution hearing, a prima facie case for restitution is made by the People based in part on a victim's testimony on, or other claim or statement of, the amount of his or her economic loss. (*People v. Prosser* (2007) 157 Cal.App.4th 682, 690–691 [68 Cal.Rptr.3d 808]; *People v. Keichler* (2005) 129 Cal.App.4th 1039, 1048 [29 Cal.Rptr.3d 120].) "Once the victim has [i.e., the People have] made a prima facie showing of his or her loss, the burden shifts to the defendant to demonstrate that the amount of the loss is other than that claimed by the victim. [Citations.]" (*Prosser*, at p. 691.)

"The standard of review of a restitution order is abuse of discretion. 'A victim's restitution right is to be broadly and liberally construed.' [Citation.] ' "When there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court." ' [Citations.]" (*In re Johnny M.* (2002) 100 Cal.App.4th 1128, 1132 [123 Cal.Rptr.2d 316].) However, a restitution order "resting upon a ' "demonstrable error of law" ' constitutes an abuse of the court's discretion. [Citation.]" (*People v. Jennings* (2005) 128 Cal.App.4th 42, 49 [26 Cal.Rptr.3d 709].) "In reviewing the sufficiency of the evidence [to support a factual finding], the ' "power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the trial court's findings.' [Citations.] Further, the standard of proof at a restitution hearing is by a preponderance of the evidence, not proof beyond a reasonable doubt. [Citation.] 'If the circumstances reasonably justify the [trial court's] findings,' the judgment may not be overturned when the circumstances might also reasonably support a contrary finding. [Citation.] We do not reweigh or reinterpret the evidence; rather, we determine whether there is sufficient evidence to support the inference drawn by the trier of fact. [Citation.]" (*People v. Baker, supra*, 126 Cal.App.4th at pp. 468–469.)

■ "[T]he court's discretion in setting the amount of restitution is broad, and it may use any rational method of fixing the amount of restitution as long as it is reasonably calculated to make the victim whole. [Citations.]" (*People v. Baker, supra*, 126 Cal.App.4th at p. 470; see also *In re Brittany L.* (2002) 99 Cal.App.4th 1381, 1391–1392 [122 Cal.Rptr.2d 376].) "There is no requirement the restitution order be limited to the exact amount of the loss in which

the defendant is actually found culpable, nor is there any requirement the order reflect the amount of damages that might be recoverable in a civil action. [Citation.]" (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1121 [43 Cal.Rptr.2d 681, 899 P.2d 67].)

## C

First, we address the trial court's determination of the amount Payne should be reimbursed for his medical expenses. The People contend the court erred by valuing Payne's medical expenses based on the amount *paid* by his insurance company ("$133,256" [*sic*]) rather than the amount *billed* by the medical providers ($418,081). The People argue Millard should bear the burden of paying the full value of the medical services provided to Payne and should not benefit, or in effect receive a "windfall," merely because Payne fortuitously had medical insurance coverage that paid reduced amounts for those medical services.

█ Neither the language of Penal Code section 1202.4 nor apposite case law supports the People's position. Penal Code section 1202.4, subdivision (f)(3), provides that "[t]o the extent possible, the restitution order . . . shall be of a dollar amount that is sufficient to *fully reimburse* the victim . . . for every determined economic loss incurred as the result of the defendant's criminal conduct, including . . . [¶] . . . [¶] (B) Medical expenses." (Italics added.) To "fully reimburse" the victim for medical expenses means to reimburse him or her for all out-of-pocket expenses actually paid by the victim or others on the victim's behalf (e.g., the victim's insurance company). The concept of "reimbursement" of medical expenses generally does not support inclusion of amounts of medical bills in excess of those amounts accepted by medical providers as payment in full.

In *People v. Bergin* (2008) 167 Cal.App.4th 1166 [84 Cal.Rptr.3d 700], the court rejected the same contention raised by the People in this appeal. *Bergin* rejected the People's assertion that Penal Code section 1202.4 requires a criminal defendant to pay restitution in the amount actually incurred, or billed by, the victim's medical providers. (*Bergin*, at p. 1170.) Citing *Hanif v. Housing Authority* (1988) 200 Cal.App.3d 635 [246 Cal.Rptr. 192], *Bergin* concluded there was no reason *Hanif*'s holding in a tort case should not apply in a criminal victim restitution context. (*Bergin*, at pp. 1171–1172.) Accordingly, *Bergin* agreed with *Hanif* that " 'an award of damages for past medical expenses in excess of what the medical care and services actually cost constitutes overcompensation' [citation] . . . ." (*Bergin*, at pp. 1171–1172.) *Bergin* found additional support for its holding in *In re Anthony M.* (2007) 156 Cal.App.4th 1010 [67 Cal.Rptr.3d 734], which involved analogous victim restitution in a juvenile offender proceeding. (*Bergin*, at p. 1172.) *Bergin*

noted that *In re Anthony M.* held the trial court erred by awarding victim restitution for medical expenses in excess of the amount actually paid by Medi-Cal. (*Bergin*, at p. 1172.) Because "[r]estitution is to be without regard to the victim's reimbursement from other sources [e.g., victim's insurance company]," (*ibid.*) and Penal Code section 1202.4, subdivision (f) requires restitution sufficient to "fully reimburse the victim," *Bergin* concluded the trial court correctly found the victim did not incur "any economic loss beyond the amount" paid by the victim's insurance company to his medical providers. (*Bergin*, at p. 1172.) Accordingly, *Bergin* affirmed the trial court's restitution award of only the amount actually paid by the victim's insurer for medical services. (*Ibid.*) We agree with and adopt *Bergin*'s reasoning and apply it to this case.

Like *Bergin*, we believe *In re Anthony M., supra*, 156 Cal.App.4th 1010 is analogous to this case. In its juvenile offender context, *In re Anthony M.* concluded: "[T]he juvenile court erred when it imposed a restitution order in excess of the amount paid by Medi-Cal [on behalf of the victim]." (*Id.* at p. 1019.) It stated a restitution order "is not . . . intended to provide the victim with a windfall. [Citations.]" (*Id.* at p. 1017.) Rather, a victim is entitled to reimbursement only for his or her actual loss, which in that case was the amount actually paid by Medi-Cal to the victim's medical providers. (*Id.* at p. 1018.)

*People v. Hove* (1999) 76 Cal.App.4th 1266 [91 Cal.Rptr.2d 128], cited by the People, is factually inapposite and, in any event, its reasoning tends to support our conclusion. *Hove* primarily held the victim was entitled to restitution for medical expenses even though his medical expenses were paid by Medicare and/or Medi-Cal and therefore the victim did not suffer any direct economic losses. (*Id.* at pp. 1268, 1272–1273.) However, in addition to awarding restitution for past medical expenses paid by Medi-Cal, the trial court ordered restitution in the higher amount billed to Medi-Cal, "noting that there will be continuing care costs beyond the date of the [Medi-Cal report showing billed amounts and paid amounts]. Obviously, if [the victim] remains in a vegetative state the rest of his life, as expected, the costs caused by defendant's conduct will far exceed the amount of the restitution actually ordered. [¶] We therefore find that the trial court did not abuse its discretion in determining restitution on the basis of the claims amounts billed to Medi-Cal . . . ." (*Id.* at pp. 1274–1275.) Because there is no evidence Payne is in a vegetative state or otherwise will incur substantial medical expenses for the remainder of his life, we conclude *Hove* is factually inapposite and does not persuade us to reach a contrary conclusion.

We conclude the trial court applied a rational method to reasonably calculate Payne's medical expenses and therefore did not abuse its discretion

in awarding him "$133,256" (*sic*) in restitution based on the amount actually paid by his insurer to his medical providers. (*People v. Bergin, supra*, 167 Cal.App.4th at pp. 1170–1172; *In re Anthony M., supra*, 156 Cal.App.4th at pp. 1017–1019; *People v. Baker, supra*, 126 Cal.App.4th at p. 470.)

D

Millard contends the trial court erred by awarding Payne $750,000 in future lost wages. He argues the evidence is insufficient to support a finding that Payne lost any particular amount of future earnings.

Payne testified that before the accident he was employed as a customer service representative with a new home construction company. That job required considerable physical activity, performing repairs and other construction work. At the time of the accident, he was 52 years old, had been in the construction industry for 12 to 15 years, and expected to continue in that industry until his retirement had it not been for the accident. Because of his injuries, he had been unable to work since the accident. He was earning $50,000 per year plus benefits prior to the accident. He testified he did not believe he would ever be able to return to his job. He also did not believe he could return to the computer installation field in which he had once been employed because his training was now outdated. Although it had been about two years since the accident, he continued to suffer wrist and knee pain and permanent nerve damage. Nevertheless, Payne stated: "I'm sure I'll be doing something. I don't know what that's going to be right now." Although he had recently been released from therapy, he was still suffering from his injuries.

Black testified Payne's employment income before the accident was about $65,000 per year including benefits. He assumed Payne would have retired when he was 65 to 67 years old. Black concluded Payne had lost about $800,000 in future lost income because of the accident.

Day testified for the defense that he did not include any future lost income when he valued Payne's case. Because Payne had some residual earning capacity, Day believed a vocational rehabilitation evaluation and a physician's disability opinion were necessary before determining any future lost income.

The trial court concluded Payne had lost $750,000 in future earnings (in addition to $50,000 in past lost earnings). The court stated: "[T]he court has observed Mr. Payne throughout the trial and these proceedings. He is a severely injured man. The court finds that [his] statement 'I will go back to work' is a statement of hope and not of fact. He may well go back to work, in fact the court hopes that he does, but at this time it is conjectural at best."

We conclude the People made a sufficient prima facie case that Payne had lost $750,000 in future earnings. Payne testified regarding his past earnings and inability to return to his former job. Black testified Payne would lose about $800,000 in future earnings. Although, as the trial court noted, Payne was hopeful that he would eventually find another job, there was no evidence showing that prospect was sufficiently definite to preclude a reasonable inference by the court that Payne would be unable to work again during his remaining preretirement years.

After the People have "made a prima facie showing of [the victim's] loss, the burden shifts to the defendant to demonstrate that the amount of the loss is other than that claimed by the victim. [Citations.]" (*People v. Prosser, supra*, 157 Cal.App.4th at p. 691.) In the circumstances of this case, the trial court reasonably concluded the People made a prima facie showing Payne lost at least $750,000 in future earnings, and Millard did not carry his burden to then show either that amount was overstated or Payne had not lost any future earnings. The People were not required to present vocational rehabilitation expert testimony regarding the amount of Payne's future lost earnings. Based on our review of the entire record, we conclude there is substantial evidence to support the trial court's finding that Payne lost $750,000 in future earnings. (*People v. Baker, supra*, 126 Cal.App.4th at pp. 468–469.) The trial court did not abuse its discretion by awarding Payne $750,000 restitution for future lost earnings.

E

Millard contends the trial court erred by awarding Payne unreasonable attorney fees. Millard notes that although the trial court concluded Black's contingency fees of $366,666 were "unconscionable" and therefore presumably unreasonable, the court nevertheless believed it was obligated to enforce the contingency fee agreement and award the entire fee amount in restitution (before apportioning that fee between economic and noneconomic loss claims). In so doing, Millard argues the trial court abused its discretion.

The trial court stated:

"Mr. Black testified that he had between 100 and 200 hours in the case when it settled. Giving the benefit of the doubt to him, that is [an] average hourly rate of [$] 1833.33 for some letter writing. There was little skill or expertise involved in the matter. *The court finds that the contingent fee of $366,666 is unconscionable under the facts and circumstances of this case.* There is uncontradicted evidence that when such a huge amount of money is recovered with little or no effort on the part of the attorney that the practice is [to] remit part of one's fee. [¶] The rules on professional conduct support this

idea. [¶] Amount of fee in proportion to services: $366,666 divided by 200 hours gives an hourly rate of $1833[,] which is extraordinary to say the least. . . . [¶] Novelty and difficulty of questions presented. None. Illegal left turn into oncoming traffic. [¶] This case was a slam dunk from the tort liability side of the equation. The court notes that the victim was still within the throes of his accident when the case was signed up and settled. As Mr. Day testified, Mr. Payne could have obtained $1,100,000 on the facts of this case.

*"But having said all of that, the court does not believe that it has the right or jurisdiction to interfere with the contingent fee arrangement between the victim and his counsel. [¶] The court understands that it should only approve reasonable attorneys fees but then the victim suffers the loss. That is inherently unfair as between the two parties."* (Italics added.) The trial court then apportioned about 84.9 percent of those attorney fees ($366,666) to Payne's economic loss claims, awarding him $311,300 in restitution for attorney fees.

Penal Code section 1202.4 provides that a court shall require a defendant to make restitution for all of a victim's economic losses suffered as a result of the defendant's criminal conduct, including "[a]ctual and *reasonable attorney's fees* and other costs of collection accrued by a private entity on behalf of the victim." (Pen. Code, § 1202.4, subd. (f)(3)(H).) Accordingly, Payne was entitled to restitution of his attorney fees, but only to the extent those fees were reasonable. Although a trial court has discretion in determining what amount of attorney fees is reasonable, a restitution order "resting upon a ' "demonstrable error of law" ' constitutes an abuse of the court's discretion. [Citation.]" (*People v. Jennings, supra,* 128 Cal.App.4th at p. 49.) If the trial court misunderstands or misapplies the applicable legal standard, it has not properly exercised its discretion. (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 393 [33 Cal.Rptr.3d 644]; *Board of Administration v. Wilson* (1997) 57 Cal.App.4th 967, 973 [67 Cal.Rptr.2d 477]; *County of Yolo v. Garcia* (1993) 20 Cal.App.4th 1771, 1778 [25 Cal.Rptr.2d 681].)

Based on our review of the trial court's written order, we conclude the court abused its discretion because it either: (1) awarded attorney fees it found were unconscionable/unreasonable; or (2) even if it implicitly found those fees were reasonable based solely on the contingency fee agreement, it did not apply the correct legal standard in determining the amount of reasonable attorney fees. First, to the extent it found Black's contingency fee of $366,666 was "unconscionable," it appears it implicitly, if not expressly, found that fee was unreasonable. Nevertheless, it awarded Payne the full amount of that unreasonable fee because it would be "inherently unfair" for

Payne, as the victim, to bear the loss of paying Black's fee to the extent it was unreasonable. To the extent the trial court found Black's $366,666 fee was unreasonable but nevertheless awarded Payne that amount (before apportionment), it did not follow the express statutory limitation that a victim be awarded restitution only for "reasonable" attorney fees. (Pen. Code, § 1202.4, subd. (f)(3)(H).)

■ Second, to the extent the trial court implicitly found Black's contingency fee of $366,666 reasonable because the court could not "interfere with the contingent fee arrangement between the victim and his counsel," the court apparently misapplied or misunderstood the established legal standard for determining reasonable attorney fees and, in so doing, abused its discretion. Unless a statute provides otherwise, it is presumed the Legislature intended that the amount of a statutory award of reasonable attorney fees should be determined by application of the lodestar adjustment method. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1134, 1136 [104 Cal.Rptr.2d 377, 17 P.3d 735]; *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 [95 Cal.Rptr.2d 198, 997 P.2d 511].) The lodestar method calculation begins by multiplying the reasonable number of hours worked on a client's case by the reasonable hourly rate for that work. (*PLCM Group, Inc., supra*, at p. 1095.) In *Ketchum*, the California Supreme Court stated: "[T]he lodestar is the basic fee for comparable legal services in the community; it may be adjusted by the court based on factors including, as relevant herein, (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) *the contingent nature of the fee award.* [Citation.] The purpose of such adjustment is to fix a fee at the fair market value for the particular action. In effect, the court determines, retrospectively, *whether the litigation involved a contingent risk* or required extraordinary legal skill *justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services.* The ' "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong." ' [Citation.]" (*Ketchum v. Moses, supra*, 24 Cal.4th at p. 1132, italics added.)
■ *Ketchum* recognized that a contingent fee agreement may properly provide for greater compensation than otherwise might be considered reasonable. (*Ketchum, supra*, at p. 1132.) Accordingly, "[t]he purpose of a fee enhancement, or so-called multiplier, for contingent risk is to bring the financial incentives for attorneys enforcing important constitutional [or other] rights . . . into line with incentives they have to undertake claims for which they are paid on a fee-for-services basis." (*Ibid.*) "Such fee enhancements are intended to compensate for the risk of loss generally in contingency cases *as a class*. [Citation.]" (*Id.* at p. 1133.)

A court "may not determine a 'reasonable' attorney fee *solely* by reference to the amount due under a contingency agreement." (*People ex rel. Dept. of Transportation v. Yuki* (1995) 31 Cal.App.4th 1754, 1770–1771 [37 Cal.Rptr.2d 616].) Rather, a court must begin with the lodestar calculation and then make adjustments upward or downward based on the factors discussed in *Ketchum*, including whether there is a contingency fee arrangement. (*Ketchum v. Moses, supra*, 24 Cal.4th at p. 1132.) After considering all relevant factors, a court may ultimately, but is not compelled to, award as reasonable those fees set forth in a contingency fee agreement. (*Ibid.*; *PLCM Group, Inc. v. Drexler, supra*, 22 Cal.4th at p. 1096.)

Because the trial court in this case did not apply the correct method in determining the amount of reasonable attorney fees to be awarded Payne pursuant to Penal Code section 1202.4, subdivision (f)(3)(H), we conclude the court abused its discretion and reverse the restitution order for further proceedings regarding the amount of reasonable attorney fees incurred by, and to be awarded to, Payne toward restitution of his economic losses. In making that determination, the trial court shall apply the lodestar method described above, unless the People on remand show the Legislature intended another method to be used in determining reasonable attorney fees under Penal Code section 1202.4, subdivision (f)(3)(H). (*Ketchum v. Moses, supra*, 24 Cal.4th at p. 1136.)

■ To the extent Millard argues some portion of Payne's reasonable attorney fees were incurred solely to collect noneconomic losses, it will be Millard's burden to show the People's prima facie claimed amount of, or the trial court's finding on, total reasonable fees should be reduced accordingly. (Cf. *People v. Fulton* (2003) 109 Cal.App.4th 876, 884, 886–887 [135 Cal.Rptr.2d 466] [after prima facie case for reasonable attorney fee award is made, then burden shifts to defendant to show a portion of those fees is attributable solely to recovery of noneconomic losses]; *People v. Pinedo* (1998) 60 Cal.App.4th 1403, 1406 [71 Cal.Rptr.2d 151]; *In re Imran Q.* (2008) 158 Cal.App.4th 1316, 1322 [71 Cal.Rptr.3d 121].) In *Fulton*, we stated: ■ "[I]t would be improper to reduce the attorney fees incurred to obtain economic damages merely because those same attorney fees also led to the recovery of nonrecoverable damages (e.g., pain and suffering damages). Moreover, because of the strong public policy seeking to provide crime victims with direct restitution for all the 'losses they suffer' (Cal. Const., art. I, § 28, subd. (b)), when fees cannot be reasonably divided between the pursuit of economic losses as opposed to noneconomic losses, the victim is entitled to be fully reimbursed for all actual and reasonable attorney fees. [Citations.]" (*People v. Fulton, supra*, 109 Cal.App.4th at p. 885.) ■ On remand, if Millard does not carry that burden of proof, the trial court may conclude Black's fees cannot reasonably be apportioned or divided between Payne's economic and noneconomic claims. (Cf. *People v. Fulton, supra*, 109

Cal.App.4th at p. 887.) We stated in *Fulton*: "[A]s is typical in automobile accident cases, an attorney's efforts necessarily focus on proving liability and the nature and extent of the plaintiff's economic damages, with the amount of noneconomic damages dependent on substantiating these issues." (*Ibid.*) In such a case, attorney services in obtaining both types of damages (i.e., economic and noneconomic damages) may overlap and preclude a finding that any particular work was performed solely to recover noneconomic damages. (*Id.* at p. 888.) Accordingly, if Millard does not carry his burden of proof and there is "no principled way to make . . . an allocation" of reasonable attorney fees between recovery of economic and noneconomic damages, "the court should include all of the [reasonable] attorney's fees as part of its restitution order. [Citation.]" (*In re Imran Q., supra*, 158 Cal.App.4th at p. 1322.) Alternatively stated, "if [Millard] does not, or cannot, allocate fees and costs incurred in recovering economic losses and nonrecoverable general [i.e., noneconomic] damages, [Payne] may recoup the actual and reasonable attorney's fees and costs he expended in collecting restitution even if some undetermined portion of those fees and costs were spent in recovering general damages. [Citation.]" (*Ibid.*)

F

Millard also contends, and the People agree, the trial court erred by applying two different ratios in apportioning the settlement amount between economic and noneconomic damages. In apportioning Payne's attorney fees, the trial court concluded 84.9 percent of the settlement amount was for economic damages. However, in apportioning the settlement amount for purposes of crediting Millard with the amount already paid Payne for his economic damages, the court concluded 49.8 percent was for economic damages.[10]

Because we reverse the trial court's award of reasonable attorney fees and remand for further proceedings as discussed above, we need not decide whether the court's 84.9 percent apportionment of the settlement amount to economic damages for purposes of awarding attorney fees was an abuse of discretion. On remand, it is possible the trial court may find no apportionment is required if, as discussed above, Millard cannot carry his burden to prove a certain portion of Black's fees was solely attributable to the recovery of

---

[10] To the extent Millard separately asserts the trial court abused its discretion by not crediting the amount of Payne's reasonable attorney fees by the full amount pursuant to a provision of the settlement agreement regarding inclusion or payment of attorney fees, we need not address that issue because we reverse the court's attorney fee award and remand for further proceedings. In any event, Millard does not carry his burden on appeal to show the trial court abused its discretion by concluding the settlement agreement did not provide for reimbursement of Payne's reasonable attorney fees.

noneconomic damages. In that event, there will be no inconsistency between apportionment ratios. However, to the extent the trial court does apportion Black's fees based, in part, on the ratio of economic and noneconomic damages recovered by Payne pursuant to the settlement agreement, the court (absent some compelling logical reason to do otherwise) should use the same ratio it uses in apportioning the settlement proceeds for purposes of crediting Millard with prior payment toward Payne's economic losses.

G

Millard also contends his constitutional right to findings by a jury beyond a reasonable doubt was violated by the court's findings by a preponderance of the evidence at the restitution hearing. He argues that because victim restitution increases the punishment for a crime, he has a Sixth Amendment right to a jury trial and a due process right to proof beyond a reasonable doubt at a Penal Code section 1202.4 victim restitution hearing.

We disagree with Millard's premise that Penal Code section 1202.4 victim restitution constitutes increased punishment for a crime. *People v. Harvest* (2000) 84 Cal.App.4th 641 [101 Cal.Rptr.2d 135] described the purposes of victim restitution, stating:

"Although [victim] restitution has an element of deterrence [citation], the primary purpose of victim restitution is to provide monetary compensation to an individual injured by crime. [Citation.] Compensation is the defining feature of civil law. [Citations.] Postcriminal proceedings vindicating the remedial purpose of reimbursement have long been treated as not constituting punishment for double jeopardy purposes. [Citations.]

". . . [V]ictim restitution is limited to economic loss but is unlimited in the amount that can be ordered. The collection procedures for a restitution order are clearly meant to be civil. [Citations.] . . . We conclude from the language of the governing statutes that the Legislature intended victim restitution as a civil remedy rather than as a criminal punishment." (*Id.* at pp. 648–649, fn. omitted.) To the extent *People v. Bernal* (2002) 101 Cal.App.4th 155 [123 Cal.Rptr.2d 622], cited by Millard, contains language to the contrary (i.e., restitution as a penalty or punishment), we are not persuaded *Bernal* intended to include punishment as a purpose of victim restitution and, in any event, decline to follow that reasoning. Rather, we agree with *People v. Harvest, supra*, 84 Cal. App. 4th 641, that the primary purpose of a victim restitution hearing is to allow the People to prosecute an expedited hearing before a trial court to provide a victim with a civil remedy for economic losses suffered, and not to punish the defendant for his or her crime. To the extent a victim restitution order has the secondary purposes of

rehabilitation of a defendant and/or deterrence of the defendant and others from committing future crimes, those purposes do not constitute increased punishment of the defendant, as Millard asserts.

Furthermore, Penal Code section 1202.4's requirement that a trial court issue an order providing for full restitution of a victim's economic losses does not constitute a sentencing choice by the trial court. Rather, because that statute requires the court to award the victim full restitution, the court's determination of that amount in a restitution hearing by a preponderance of the evidence does not involve a defendant's Sixth Amendment right to a jury or proof beyond a reasonable doubt. Recent cases regarding sentencing of defendants are inapposite and do not persuade us to conclude otherwise.[11] (See, e.g., *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]; *United States v. Booker* (2005) 543 U.S. 220 [160 L.Ed.2d 621, 125 S.Ct. 738]; *Cunningham v. California, supra,* 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856].)

H

The People contend the trial court erred by reducing the amount of Payne's restitution by 25 percent because of his contributory or comparative negligence in causing the accident. Neither party has cited, and we have not found, any case that addresses the issue of whether the doctrine of comparative negligence may be applied to reduce the amount of Penal Code section 1202.4 victim restitution that a criminally negligent defendant must pay when the victim's negligence was also a substantial factor in causing his or her injuries.[12] We consider this issue of law to be one of first impression.

[11] Although in *People v. Giordano, supra,* 42 Cal.4th at page 662, footnote 6, the California Supreme Court recognized it had not addressed this issue since recent cases were issued regarding a defendant's Sixth Amendment rights, it declined to address that issue in *Giordano* because the defendant had not raised any constitutional challenge to the restitution hearing in that case. Nevertheless, it noted that in *Cunningham v. California* (2007) 549 U.S. 270, 281 [166 L.Ed.2d 856, 127 S.Ct. 856], the United States Supreme Court stated: " '[U]nder the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence.' [Citations.]" (*Giordano,* at p. 662, fn. 6.) In this case, Millard was granted probation. The restitution hearing was held and the restitution order was issued *after* he was granted probation. Therefore, there was no possibility that at the restitution hearing Millard could be exposed to a greater potential sentence for his crime. (*Cunningham,* at p. 281.)

[12] This issue was briefly alluded to, but not addressed, in *People v. Dehle* (2008) 166 Cal.App.4th 1380, at pages 1388–1389 [83 Cal.Rptr.3d 461]: "While we express no opinion on the resolution of these issues [which the People were not present to address], they include, among others, the following: given the fact that it appears that the decedent was not wearing a seatbelt at the time of the accident, whether the decedent's own negligence contributed to his death and whether defendant should be required to make restitution for economic harm caused in part by the victim himself . . . ."

In its victim restitution order, the trial court addressed Millard's claim that the doctrine of comparative fault should be applied to reduce the amount of restitution for Payne's economic losses in proportion to his comparative or contributory fault in causing the accident. Noting that Millard's offense was a "negligence[-]type crime," the court was unable to find any cases on point. Nevertheless, citing *Sommers, supra,* 2 Cal.App.4th 1644, the trial court noted *Sommers* addressed a similar statute (i.e., Code Civ. Proc., § 1021.4)[13] and had concluded a victim's fault was one of the factors to be considered by the trial court in awarding attorney fees. The trial court in this case stated:

"[T]he victim [e.g., Payne] should not profit more because a person was under the influence when the victim contributed to the accident and his injuries. The [P]eople argue that 'innocence' is in the criminal law sense and not the tort sense. *Sommers* seem[s] to belie this concept. . . . But as noted in *Sommers,* fault on a victim's part should not be a bar[,] just a factor to be considered by the court in [its] analysis. [Citation.]

"The court finds that the evidence is clear that Mr. Payne was driving at a high rate of speed, driving an unsafe vehicle, was untrained in motorcycle driving, took no evasive maneuvers and in essence went straight into the defendant's car without even a minimal amount of avoidance taken. Mr. Payne even had himself in the 3rd lane of traffic prior to the accident. The court having heard the trial became convinced that Mr. Payne was a contributory cause of the accident.

". . . Comparative fault is not a defense to the crime. [Payne] is entitled to restitution. [¶] The court in weighing the factors of the trial finds that 25 [percent] is a reasonable figure to assign for contributory negligence to Mr. Payne. The court does this under the concept that it should order full restitution unless it finds compelling and extraordinary reasons for not doing so. When a victim in a non[-]malice type case, i.e.[,] driving while under the influence and causing injury with no aggravation involved. A simple illegal left turn is what this case was. . . . [J]ustice and fairness require that the court make the 25 [percent] adjustment based on the court hearing the trial, evaluating the evidence and the witnesses and the facts." Multiplying Payne's total economic losses of "$1,254,286" (*sic*) by Millard's 75 percent comparative fault (in effect imposing partial responsibility on Payne for his 25 percent comparative fault), the court concluded Millard was responsible for $933,964 of Payne's economic losses (before granting Millard credit of $547,800 for economic losses already paid pursuant to the settlement agreement).

[13] Code of Civil Procedure section 1021.4 provides: "In an action for damages against a defendant based upon that defendant's commission of a felony offense for which that defendant has been convicted, the court may, upon motion, award reasonable attorney's fees to a prevailing plaintiff against the defendant who has been convicted of the felony."

In *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226] (*Li*), the California Supreme Court adopted the system of pure comparative negligence. (*Id.* at pp. 828–829.) "[T]he fundamental purpose of [the system of pure comparative negligence] shall be to assign responsibility and liability for damage in direct proportion to the amount of negligence of each of the parties." (*Id.* at p. 829.) The doctrine of comparative fault generally requires comparative fault analysis regardless of whether the parties' respective negligence is considered ordinary, gross, reckless, or willful and wanton. (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 781 [62 Cal.Rptr.3d 527, 161 P.3d 1095]; *Sorensen v. Allred* (1980) 112 Cal.App.3d 717, 725 [169 Cal.Rptr. 441] ["[N]o defensible reason exists for categorizing wilful and wanton misconduct as a different kind of negligence not suitable for comparison with any other kind of negligence. The adoption of comparative negligence in *Li* rendered such a separate category unnecessary since contributory negligence on the part of a plaintiff was no longer a total bar to recovery for a tortious injury."].) However, "a party who commits intentional misconduct should not be entitled to escape responsibility for damages based upon the negligence of the victim . . . . [Citations.]" (*Weidenfeller v. Star & Garter* (1991) 1 Cal.App.4th 1, 7 [2 Cal.Rptr.2d 14].) One court noted there is "an unbroken line of authority barring apportionment [based on comparative fault] where . . . the defendant has committed an intentional tort [e.g., battery] and the injured plaintiff was merely negligent." (*Heiner v. Kmart Corp.* (2000) 84 Cal.App.4th 335, 350 [100 Cal.Rptr.2d 854]; cf. *Thomas v. Duggins Construction Co., Inc.* (2006) 139 Cal.App.4th 1105, 1112 [44 Cal.Rptr.3d 66] [recognizing deterrence and punishment policy reasons *preclude* a reduction of an intentional tortfeasor's liability in proportion to the plaintiff's contributory negligence].)

We have not found any case that has addressed the question of whether the doctrine of comparative negligence may be applied to reduce a criminally negligent defendant's obligation to pay Penal Code section 1202.4 restitution to a victim whose negligence was also a substantial factor in causing the victim's injuries. Furthermore, our review of applicable constitutional and statutory provisions shows that question has not been, either expressly or implicitly, addressed. On the date of the judgment in this case, article I, section 28, subdivision (b), of the California Constitution provided: "It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to restitution from the persons convicted of the crimes for losses they suffer. [¶] Restitution shall be ordered from the convicted persons in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss, unless compelling and extraordinary reasons exist to the

contrary." Accordingly, the California Constitution does not address the instant question. Similarly, Penal Code section 1202.4, subdivision (f)(3), provides: "To the extent possible, the restitution order shall be prepared by the sentencing court, shall identify each victim and each loss to which it pertains, and shall be of a dollar amount that is *sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct . . . .*" (Italics added.) At first glance, that statutory provision arguably could be interpreted as requiring a criminally negligent defendant to fully reimburse a victim for all of the victim's economic losses without regard to the victim's contributory negligence. (Cf. *People v. Thygesen* (1999) 69 Cal.App.4th 988, 991–992 [81 Cal.Rptr.2d 886] [trial court is required to order full restitution to a crime victim].) However, on closer review, we conclude that provision should be interpreted as requiring a criminally negligent defendant to reimburse a victim only to the extent his or her criminal conduct caused the victim's economic losses, thereby implicitly allowing the application of the doctrine of comparative negligence to preclude restitution to the extent the victim's own negligence was a cause of his or her injuries. A criminal defendant is required to reimburse his or her victim only for those economic losses suffered "as the result of the defendant's criminal conduct." (Pen. Code, § 1202.4, subd. (f)(3).) If the doctrine of comparative negligence were not applicable, a criminally negligent defendant could be required to reimburse a victim for economic losses that were comparatively the result or the fault of the victim's own negligence.

In our view, absent any express constitutional or statutory provision or judicial authority to the contrary, we believe our interpretation of Penal Code section 1202.4, subdivision (f)(3), results in a more logical and consistent approach toward victim restitution that, in effect, parallels a victim's usual tort civil remedy for economic losses caused by the defendant's criminal conduct. Although a Penal Code section 1202.4 victim restitution order is obtained by means of an expedited criminal hearing prosecuted by the People, there do not appear to be any compelling policy or other reasons to preclude the application of the doctrine of comparative negligence by a trial court in ordering a criminally negligent defendant to pay restitution to a victim whose economic losses were also caused in part by the victim's contributory negligence. For example, if a trial court found that a defendant's criminal negligence was only a 5 percent factor in causing a victim's losses and the victim's own negligence was a 95 percent factor in causing his or her own losses, a restitution order compelling the defendant to pay 100 percent of the victim's economic losses would be contrary to *Li*'s stated fundamental principle of comparative negligence (i.e., assigning responsibility and liability

for damage in direct proportion to the amount of negligence of each of the parties).[14] (*Li, supra*, 13 Cal.3d at p. 829.)

As the trial court noted in this case, *Sommers* involved a similar civil restitution statute (i.e., Code Civ. Proc., § 1021.4) that allows a trial court to award reasonable attorney fees to a prevailing plaintiff against a convicted defendant whose liability is based on commission of a felony offense. (*Sommers, supra*, 2 Cal.App.4th at p. 1647.) In *Sommers*, we concluded "the fault of [the victim] in the collision, or even his criminal behavior, is not a bar to recovery of attorney's fees under [Code of Civil Procedure] section 1021.4. It, under the teaching of [*Wood v. McGovern* (1985) 167 Cal.App.3d 772 [213 Cal.Rptr. 498]], is merely a factor for the trial court to consider in its discretion to award such fees." (*Sommers*, at p. 1650.) Accordingly, *Sommers* in effect concluded a trial court could consider and apply the doctrine of comparative negligence as one factor in awarding a prevailing plaintiff reasonable attorney fees in an action against a convicted defendant based on his or her criminal conduct. Applying *Sommers*'s reasoning to victim restitution under Penal Code section 1202.4, we discern no logical or policy reason why a trial court should not be able to consider a victim's comparative or contributory negligence in determining the amount of restitution a defendant must pay for that victim's economic losses caused by, or as a result of, the defendant's criminal negligence.[15] The fundamental principle of comparative negligence is to assign responsibility and liability for damage in direct proportion to the amount of negligence of each of the parties. (*Li, supra*, 13 Cal.3d at p. 829.) The application of comparative negligence in all cases involving negligent conduct presumably has a deterrent effect on all persons to avoid negligent conduct. In the context of driving, the doctrine of comparative negligence encourages all drivers to drive their vehicles with reasonable care. Accordingly, drivers are charged with the knowledge that if they drive negligently and are partially at fault for injuries caused by their negligence, they will be held responsible for their proportionate fault in causing those injuries. Were a negligent driver not held responsible in part for his or her comparative or contributory negligence when another driver's

---

[14] Cf. *Zavala v. Regents of University of California* (1981) 125 Cal.App.3d 646, 647, 650–651 [178 Cal.Rptr. 185] [comparative negligence applied in personal injury action where jury apportioned 80 percent of liability for plaintiff's injuries to his own willful misconduct (i.e., voluntary intoxication) and 20 percent to defendants' ordinary negligence (i.e., continuing to serve alcohol to plaintiff)].)

[15] "Contributory negligence is a term of art. It is negligence of a plaintiff in failing to exercise care for [himself or] herself that is one of the causes of [his or] her harm. Under this definition, contributory negligence differs from negligence, which is a failure to exercise reasonable care for others. [¶] Nevertheless, to a very large extent contributory negligence analysis parallels negligence analysis." (Dobbs, The Law of Torts (2001) § 199, p. 495, fns. omitted.) That authority further states: "Under a pure comparative fault regime, [a plaintiff's contributory negligence] merely reduces the amount of the award to a plaintiff who is chargeable with contributory fault." (Dobbs, The Law of Torts, *supra*, § 201, p. 503.)

criminal negligence was also a substantial factor in causing a victim's injuries, the fundamental purpose of comparative negligence would not be supported.

Although, as the People note, Proposition 8 and Penal Code section 1202.4 require a criminal defendant to fully reimburse a victim for all economic losses that resulted from his or her criminal act, we do not believe the application of the doctrine of comparative negligence is barred by those provisions when a defendant's offense is, in effect, merely criminal negligence, in contrast to the intentional crimes and torts (e.g., murder, robbery, and battery) to which the doctrine of comparative negligence would not apply. (Cf. *Heiner v. Kmart Corp., supra*, 84 Cal.App.4th at p. 350.) Application of comparative negligence holds a criminally negligent defendant responsible for the full amount of the victim's economic losses that resulted from the defendant's proportionate fault. In such circumstances, we do not believe the application of comparative negligence is contrary to either the express provisions or the purposes of Proposition 8 and Penal Code section 1202.4. The victim will still receive full reimbursement for economic losses attributable to the criminally negligent defendant's offense (i.e., in proportion to the defendant's fault in causing the victim's losses).

We do not believe the deterrence and rehabilitation purposes of victim restitution requirements will be undermined by the application of comparative negligence in cases involving only criminal negligence. A criminally negligent defendant will still be held responsible for the full amount of economic losses caused by or attributable to his or her criminal act. Furthermore, there is nothing in the language of Proposition 8 or Penal Code section 1202.4 expressly or implicitly providing that a victim should not be held responsible for his or her own comparative or contributory negligence by reducing the amount of victim restitution to the proportionate amount of economic losses attributable to the criminally negligent defendant's comparative fault. Had California voters or the Legislature intended to preclude the application of the doctrine of comparative negligence in those cases, they could have expressly so provided. Until the California Constitution or the Penal Code is so amended or a higher court holds otherwise, we conclude a trial court is not precluded from applying the doctrine of comparative negligence to reduce the amount of Penal Code section 1202.4 victim restitution that a criminally negligent defendant must pay when the victim's negligence was also a substantial factor in causing his or her economic losses. The trial court in this case did not abuse its discretion by applying the doctrine of comparative negligence to reduce the total amount of Payne's economic losses by 25 percent in proportion to his contributory fault

in causing those losses, and by ordering Millard to pay only that 75 percent of Payne's losses attributable to his criminal negligence.[16]

Although the People cite concerns that the application of comparative negligence in cases of criminal negligence will undermine the statutory scheme and intent that victim restitution hearings be expedited and not prolonged evidentiary hearings on the parties' respective negligence, we conclude a trial court has sufficient discretion to appropriately limit the evidence admitted at a victim restitution hearing to avoid an unduly pro- longed and involved hearing. Furthermore, as in this case, a trial court may already have heard evidence at the trial on the defendant's guilt, which may tend to show the parties' comparative fault in causing the victim's economic losses. Although a defendant's due process rights are limited at a restitution hearing (*People v. Cain* (2000) 82 Cal.App.4th 81, 86 [97 Cal.Rptr.2d 836]) and trial courts have discretion regarding the formalities they follow and the evidence they consider at such hearings (*People v. Keichler, supra*, 129 Cal.App.4th at p. 1048; *People v. Foster* (1993) 14 Cal.App.4th 939, 947 [18 Cal.Rptr.2d 1], superseded by statute on another ground as noted in *People v. Sexton* (1995) 33 Cal.App.4th 64, 70 [39 Cal.Rptr.2d 242]), to the extent the prosecution's (or the defense's) case on the defendant's guilt did not focus on the victim's conduct (e.g., exercise of reasonable care), it would be the better practice for a trial court to allow the parties at the victim restitution hearing to present at least truncated evidence (e.g., declarations, expert or percipient witness testimony) on the defendant's and victim's respective faults in causing the victim's economic losses. The People do not persuade us the presentation of such evidence at victim restitution hearings would be so burdensome on the People that the doctrine of comparative negligence should, as a matter of public policy, never be considered by a trial court in a case involving criminal negligence. We do not doubt prosecutors generally

---

[16] By so concluding, we need not address the trial court's apparent conclusion that Payne's restitution amount should be reduced because he was not an "innocent victim" under article I, section 28, subdivision (a), of the California Constitution. In any event, were we to address that issue, we doubt Payne would be precluded from receiving victim restitution under that classification, because he was a "crime victim" entitled to restitution. (Cal. Const., art. I, § 28, former subd. (b).) Furthermore, we need not address the trial court's conclusion that there were "compelling and extraordinary reasons" for it to award Payne less than the full amount of his economic losses. (Cal. Const., art. I, § 28, former subd. (b) ["Restitution shall be ordered from the convicted persons in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss, unless compelling and extraordinary reasons exist to the contrary."]; Pen. Code, § 1202.4, subd. (g) ["The court shall order full restitution unless it finds compelling and extraordinary reasons for not doing so, and states those reasons on the record."].) In our view, a trial court need not first find such "compelling and extraordinary reasons" as a prerequisite to application of the doctrine of comparative negligence in exercising its discretion in determining the amount of Penal Code section 1202.4 victim restitution a criminally negligent defendant must pay.

have sufficient training and abilities to prepare cases and present evidence on the respective faults of defendants and victims in causing the economic losses of victims.

## I

The People also contend the trial court abused its discretion by reducing the amount of restitution because it disagreed with the law. They extensively quote excerpts from the transcript of the restitution hearing to support their position that the court reduced Payne's restitution because it disagreed with Penal Code section 1202.4's mandate. For purposes of this opinion, we need not repeat the excerpts quoted by the People. Rather, based on our review of those excerpts, we conclude the People have not carried their burden on appeal to show the trial court disagreed with, and therefore did not follow, Penal Code section 1202.4's mandate that it award Payne full restitution for his economic losses. Rather, the quoted excerpts merely show the trial court believed, as we concluded above, the doctrine of comparative negligence should be applied to reduce the amount of restitution awarded to a victim in proportion to his or her comparative or contributory fault.

## J

The People also contend there is insufficient evidence to support the trial court's finding that Payne was 25 percent comparatively at fault for his economic losses. Applying the substantial evidence standard of review, we conclude there is substantial evidence to support the court's finding. At the trial on his guilt, Millard presented the testimonies of both percipient and expert witnesses (e.g., Millard, Otto, and Obenski), as summarized in the factual and procedural background section above, that would support reasonable inferences by the trial court that Payne was speeding, inattentive, wore a dark face shield, drove an unsafe motorcycle, and/or failed to attempt to avoid the collision. We need not repeat that evidence here. Based on that evidence, the court could reasonably find Payne was negligent and his negligence was a substantial factor in causing the collision and his injuries. Weighing the evidence on Millard's criminal negligence against evidence on Payne's contributory negligence, the trial court reasonably concluded Payne was 25 percent comparatively at fault for his economic losses. The People's extensive discussion regarding the inconsistencies between the People's evidence and the defense evidence primarily goes to the weight of their respective evidence and does not show the defense evidence on Payne's negligence was necessarily incredible or otherwise insubstantial. (*People v. Baker, supra,* 126 Cal.App.4th at pp. 468–469.) Accordingly, we conclude there is substantial evidence to support that finding by the trial court.

## DISPOSITION

The judgment is affirmed. The restitution order is reversed to the extent it awarded attorney fees and costs. In all other respects, the order is affirmed. The matter is remanded to the trial court for further proceedings consistent with this opinion.

Haller, Acting P. J., and Irion, J., concurred.

A petition for a rehearing was denied July 20, 2009, and the petitions of both respondent and appellant for review by the Supreme Court were denied October 14, 2009, S175121.