Filed 4/8/14  P. v. Gonzales CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY JAMES GONZALES et al.,<br><br>    Defendants and Respondents;<br><br>DENNIS CARLTON,<br><br>    Appellant. | A136902<br><br>(Contra Costa County<br>Super. Ct. Nos. 051106574 &<br>11555184) |

In this appeal, Dennis Carlton, a crime victim, appeals from the trial court's restitution order issued against defendants Anthony James Gonzales, Marcelina Louise Gallardo, and Rahim Kenjoni.  He claims the court abused its discretion in allowing the defendants' expert witness to testify out of order at the restitution hearing, and asserts the court improperly struck his own direct testimony when he refused to commit to a return date to conduct his cross-examination.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

On November 6, 2010, Carlton met with Kenjoni and Gallardo, whom he believed were husband and wife, at a Starbucks coffee shop.  Carlton brought a briefcase with him containing various pieces of jewelry and other items.  He had spoken with Kenjoni on several prior occasions, understanding him to be a serious buyer of jewelry that Carlton

1

had advertised on Craigslist as being for sale. Carlton planned to show the couple a four-carat ruby ring, in addition to a few other pieces of jewelry.

Carlton showed Kenjoni and Gallardo several pieces of jewelry as they sat at a table. At some point, Gonzales ran toward Carlton, wrestled his briefcase from him, and ran away. Carlton ran after him and yelled at witnesses to contact the police. Gonzales entered the passenger side of a vehicle, which then drove from the area. A witness recorded the vehicle's license plate number. Subsequently, all three defendants were charged in connection with the offense. The stolen jewelry was not recovered.

On November 29, 2010, defendant submitted a letter to the district attorney's office claiming a loss "of business property and future earnings" in the amount of $160,796.

On September 26, 2011, Gonzales plead no contest to felony second degree robbery (Pen. Code, §§ 211, 212.5, subd. (c)).[1] That same day, the trial court suspended imposition of sentence, placed him on formal probation, and ordered him to serve 270 days in jail. The court also fined him $200 (§ 1202.4, subd. (b)(1)) and ordered him to make victim restitution following a restitution hearing.

On October 26, 2011, Gallardo and Kenjoni pled no contest to being Gonzales's accomplices in grand theft. (§ 487, subd. (c).) That same day, the trial court suspended imposition of sentence for Gallardo, placed her on three years probation, and ordered her to serve 120 days in jail. The court also fined her $200 (§ 1202.4, subd. (b)(1)), and ordered her to make restitution to Carlton in the amount of $160,796, with the right to contest that amount at a hearing. The court suspended imposition of sentence for Kenjoni and ordered that he serve a split sentence on probation of 14 months in county jail and 22

---

[1] All further undesignated statutory references are to the Penal Code unless otherwise indicated.

months in supervision jail. The court also fined him $200 (§ 1202.4, subd. (b)(1)). Further victim restitution costs were to be determined following the restitution hearing.

On April 9, 2012, a restitution supplemental report was filed indicating Carlton was now requesting restitution in the total amount of $1,285,631.42, including over $1 million dollars "for possible future losses, projected 26 years to age 86 (based on total income of $42,412.00 for tax year 2009)."

On April 13, 2012, Carlton testified on direct examination at the restitution hearing. He stated the briefcase that Gonzales stole had contained approximately 37 items of precious diamonds, emeralds, rubies, sapphires, gold, silver, coins, and other items. He indicated he had generated a document reflecting his fair market valuation of the jewelry, which he had already submitted to the police and the district attorney's office. His appraisal report was based on his status as a gemologist, and his experience of each item that was stolen. At the conclusion of his direct testimony, the trial court continued the hearing to May 18, 2012 for cross-examination.

The continued restitution hearing was set for 1:30 p.m. on May 18, 2012. However, the hearing did not commence until 3:30 p.m. because the trial court's calendar had been "careening out of control" that day. The court decided to call the defendants' expert witness out of order, ahead of Carlton's cross-examination, as the witness had traveled some distance to arrive at the court's location. The district attorney objected, noting Carlton had been to court numerous times and was eager to finish his testimony. Carlton was asked to leave the hearing after defense counsel requested he be excluded while the expert testified.

Defendants' expert witness, Sherry Yarnal, testified that she had appraised thousands of gems. The appraisal of a single gem takes her between one and a half and two hours, and for each gem appraised she generates a 12-page report. Creating such an appraisal report to determine a gem's value requires "a comparative analysis of [the] stone," which involves taking measurements of the gem, and judging its quality in terms

3

of color, clarity, cut, and carat weight. She also testified that she keeps extensive written and computerized records of every gem she buys or sells in the course of her business, and she keeps records of all transactions for at least seven years. There is always a written record for every gem she buys or sells. All transactions involve paperwork, and she would never buy or sell a gem without such a record attesting to its appraised value. In her opinion, a professional jeweler keeping such information entirely in his memory is unheard of. Written records are necessary for tax purposes, among other reasons.

Yarnal examined the documentation that Carlton had provided to support his estimation of the value of the jewelry he lost during the robbery. In comparing photographs of his jewelry to the descriptions of the jewelry he had provided, Yarnal opined that the descriptions were too vague to support the listed valuations. Moreover, to the extent that she could form an opinion of the value of the jewelry from the photographs and descriptions, his valuations appeared to be severely inflated. She estimated that some of his valuations could be three times more than what she would expect to be the market value of the piece of jewelry.[2]

At the conclusion of Yarnal's testimony, the trial court attempted to find a court date on which Carlton would be available to return for cross-examination. He refused to agree to a future hearing date, initially claiming that his availability would depend on what his doctors told him. The court then asked: "Mr. Carlton, is there any date I can make available for you for the continuation of the hearing?" He responded: "I am not going to have the time. Nineteen months is too much time already. It should have gone to trial. It's stolen property. You should have it seized. All the relevant people are in court. I object. It's obvious. It's a no-brainer." He then left the courtroom. The court

---

[2] Approximately six weeks after Yarnal testified, Carlton sent her a letter in which he threatened to file suit against her if she did not pay him $1,314,884.14 in "damages." Additionally, when he addressed the court at the final restitution hearing on July 13, 2012, he requested that the court not only strike Yarnal's testimony as irrelevant, but also demanded that the court order her arrest and prosecution, as well as that of her husband.

4

found he had voluntarily absented himself from the proceedings and granted the defendants' request to strike his direct testimony.

On August 10, 2012, the trial court ordered Gonzales, Gallardo, and Kenjoni to pay $1,063 in restitution to Carlton. Restitution was granted for the loss of silver coins and various other items, as well as for $767 in medical expenses. All other claims for restitution were denied. This appeal followed.

## DISCUSSION

### I. Standing

Gallardo argues that this appeal is unauthorized, claiming Carlton's counsel had no authority to file a notice of appeal on the public prosecutor's behalf, and that Carlton has no authority to exercise "the People's sole right to appeal." We disagree.[3]

The right to appeal is normally statutory. An order is not appealable unless expressly made so by statute. (*People v. Valenti* (1957) 49 Cal.2d 199, 204, disapproved on other grounds in *People v. Sidener* (1962) 58 Cal.2d 645, 647; *People v. Chi Ko Wong* (1976) 18 Cal.3d 698, 709, disapproved on other grounds in *People v. Green* (1980) 27 Cal.3d 1, 33-34.) "Article I, section 28 of the California Constitution originally was enacted by initiative in 1982 as 'The Victims' Bill of Rights' [citation] and amended by initiative in 2008 as the 'Victims' Bill of Rights Act of 2008: Marsy's Law' [citation]." (*In re David* (2012) 202 Cal.App.4th 675, 681, fn. 5.) Subdivision (b) of this section "provides certain 'rights' to victims of crime, including, inter alia, the rights of privacy, notice of proceedings, *and restitution*." (*In re David, supra,* at p. 681, italics added.) Additionally, subdivision (c)(1) of this section states: "A victim, *the retained attorney of a victim,* a lawful representative of the victim, or the prosecuting attorney upon request of the victim, *may enforce the rights* enumerated in subdivision (b) in any trial *or appellate*

---

[3] We previously denied Gallardo's motion to dismiss this appeal on these same grounds.

5

*court* with jurisdiction over the case as a matter of right." (Cal. Const., art. I, § 28, subd. (c)(1), italics added.)

In spite of the above language, Gallardo contends these constitutional provisions do not authorize a private party's appeal of restitution orders to confer appellate jurisdiction. She claims the term "enforce" merely allows a victim, his or her attorney, or a prosecutor subsequently to enforce and collect the ordered amount in any court with jurisdiction, as if it were a civil judgment. (§1202.4, subds. (a)(3)(B), (h), & (i).) She further argues Marsy's Law did not confer authority to a private party to exercise the People's sole right to appeal and obtain jurisdiction.

We conclude a victim has the right to a restitution hearing under Marsy's Law, which right includes the option to appeal an order issued at that hearing. Under article I, section 28, subdivision (b)(13) of the California Constitution, restitution is one of the rights victims may pursue, and a restitution hearing is normally the setting in which victims obtain their entitlement to restitution from criminal defendants. To interpret Article I, section 28, subdivision (c)(1) in a manner that would deny victims the right to appeal adverse rulings would essentially render their rights illusory. Accordingly, we conclude Carlton had a right to seek restitution at the restitution hearing and that he can now challenge the trial court's ruling in this appeal.

## II. *Restitution and the Standard of Review*

As noted above, the California Constitution gives crime victims a right to restitution and, consequently, requires a trial court to order a convicted wrongdoer to pay restitution in every case in which a crime victim suffers a loss. (Cal. Const., art. I, § 28, subd. (b)(13)(B).) To implement this requirement, section 1202.4, subdivision (f) generally provides that "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." The

6

restitution amount "shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct . . . ." (§ 1202.4, subd. (f)(3).) "The defendant has the right to a hearing before a judge to dispute the determination of the amount of restitution." (§ 1202.4, subd. (f)(1).)

"At a victim restitution hearing, a prima facie case for restitution is made by the People based in part on a victim's testimony on, or other claim or statement of, the amount of his or her economic loss. [Citations.] 'Once the victim has [i.e., the People have] made a prima facie showing of his or her loss, the burden shifts to the defendant to demonstrate that the amount of the loss is other than that claimed by the victim. [Citations.]' [Citation.]" (*People v. Millard* (2009) 175 Cal.App.4th 7, 26 (*Millard*).) A "defendant bears the burden of proving that the amount of restitution claimed by the victim exceeds repair or replacement cost of lost or damaged property," but the defendant is not required to meet that burden until the replacement or repair cost of the victim's property is established. (*People v. Vournazos* (1988) 198 Cal.App.3d 948, 958-959.)

" 'The standard of review of a restitution order is abuse of discretion. "A victim's restitution right is to be broadly and liberally construed." [Citation.] " 'When there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court.' " [Citations.]' [Citation.] However, a restitution order 'resting upon a " 'demonstrable error of law' " constitutes an abuse of the court's discretion. [Citation.]' [Citation.] 'In reviewing the sufficiency of the evidence [to support a factual finding], the " 'power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the trial court's findings." [Citations.] Further, the standard of proof at a restitution hearing is by a preponderance of the evidence, not proof beyond a reasonable doubt. [Citation.] "If the circumstances reasonably justify the [trial court's] findings," the judgment may not be overturned when the circumstances might also

7

reasonably support a contrary finding.  [Citation.]  We do not reweigh or reinterpret the evidence; rather, we determine whether there is sufficient evidence to support the inference drawn by the trier of fact.  [Citation.]'  [Citation.]" (*Millard, supra,* 175 Cal.App.4th 7, 26.)

### III.  Carlton's Claims of Error Fail

#### A.  The Taking of Yarnal's Testimony

Carlton first asserts the trial court erred in permitting defendants to call their expert witness out of order before his cross-examination.  The primary authority he cites in support of this claim is Evidence Code section 772.  We cannot agree with his assertion that this statute imposes any mandatory requirement that all phases of a particular witness's testimony be concluded without interruption by the taking of other testimony.  Evidence Code section 772 provides, in pertinent part, only that "(a) The examination of a witness shall proceed in the following phases: direct examination, cross-examination, redirect examination, recross-examination . . . . [¶]  (b) Unless for good cause the court otherwise directs, each phase of the examination of a witness must be concluded before the succeeding phase begins."

Contrary to the position taken by defendant,  Evidence Code section 772 does not require that all phases of the examination of a witness be concluded without interruption. The statute provides only that each phase of a witness's testimony shall be completed before the next phase commences: i.e., direct examination must be completed before cross-examination commences.  Obviously, there was no deviation from this procedure here, since defendant's direct examination was completed before Yarnal testified.

In any event, the court did not act improperly in calling Yarnal out of turn.  The decision was based on unforeseen congestion of the court's calendar, combined with a reasonable exercise of courtesy towards an expert witness who had traveled some distance to the court and who, unlike Carlton, had no personal stake in the matter.  The court did not seek to deliberately impede Carlton's cross-examination.  Moreover, instead

of working with the court to establish a new date for his testimony, Carlton flatly advised the court he would not be available. While his evident frustration is perhaps understandable, unforeseen delays are simply an inherent part of court proceedings and are not to be taken personally.[4]

### B. Even If the Trial Court Erred, Carlton Does Not Show Prejudice

Carlton next asserts the trial court erred in striking his testimony as a sanction for not agreeing to commit to a return date for his cross-examination. Even if we accept his assertion, we discern no prejudice.

The trial court found there was "an absence of any credible factual basis to support Mr. Carlton's claim of $160,000.00 as to the value of the stolen jewelry." Additionally, the court indicated that, even if it had considered Carlton's stricken testimony, the court would have found it was not sufficient to show he had suffered a loss of property in the amount claimed. For example, the court noted Carlton did not produce any computerized inventory, bills of sale, purchasing receipts, or insurance appraisals to verify his claim. Thus, there was essentially no documentation to corroborate Carlton's valuations. Under the circumstances, we do not agree with Carlton's contention that this was a "close case." We also disagree with his contention that without cross-examination the trial court could not rationally have determined his evidence to be insufficient to support his claim for the stolen jewelry. Defendants were not required to cross-examine him at all and, under the circumstances, it is difficult to see how such examination would have aided him in substantiating his claim.[5]

---

[4] While Carlton contends that he provided an intelligible and medically necessary reason to refuse to return at a later date, we note he did attend the final restitution hearing on July 13, 2012.

[5] On appeal, Carlton does not contend that admitting the direct examination testimony would have led the court to find him entitled to some or all of the million dollars in future lost income he sought.

The trial court's conclusion that Carlton failed to sufficiently prove his losses is supported by substantial evidence, particularly the testimony of Yarnal as to industry standards for the proper documentation of precious stones and jewelry. Relying on Yarnal's testimony, the court found the values asserted by Carlton appeared to be inflated, and the descriptions he provided "lacked the necessary information to substantiate the proposed valuation of $160,000.00." For example, in estimating from memory the value of the pieces of jewelry stolen from him, he applied a formula of $3,200 per carat to an aggregate weight of 50 carats to reach a value of $160,000 for the stolen gems. The accuracy of this method of appraising the market value of gems was placed into doubt by Yarnal's testimony that, while carat weight is relevant, equally important variables are a gem's color, clarity, and cut. Moreover, the aggregate carat weight for a group of gems is not an accurate gauge of value, because a single larger gem is worth much more than several smaller gems that total to the same weight.

Given the evidence undercutting the credibility of his valuation, it is not reasonably probable Carlton would have obtained a more favorable outcome with regard to the property loss claim had the court considered his direct testimony. In determining restitution, a court must "employ a method that is rationally designed to determine the . . . victim's economic loss." (*People v. Giordano* (2007) 42 Cal.4th 644, 663-664.) Our review of the record substantiates the lower court's conclusion that Carlton had failed to provide the court with a rationally designed method for determining the value of the stolen jewelry. Based on the expert testimony from Yarnal and Carlton's lack of reasonable documentation, the substantial amounts he sought were not appropriate in the restitution hearing context. "The purpose of an order for victim restitution is threefold, to rehabilitate the defendant, deter future delinquent behavior, and make the victim whole by compensating him for his economic losses. [Citation.] . . . [¶] The order is not however, intended to provide the victim with a windfall. [Citations.]" (*In re Anthony M*. (2007) 156 Cal.App.4th 1010, 1017.)

10

### C. The Award Was Not Unconscionably Low

Finally, Carlton claims that the restitution order must be reversed because it was "unconscionably low." In so arguing, he neither discusses the evidence before the court nor cites any legal authority pertinent to the claim of error.

An appellate court is not required to conduct an independent search of the record to determine the sufficiency of the evidence. Because Carlton has failed to discuss the evidence and explain why it does not support the court's restitution award, his claim of error is forfeited. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) Regardless, we have already concluded the trial court properly rejected his inflated and unsupported estimates regarding his claimed lost property and income. The court did award restitution for his medical expenses and various other items that it found were either substantiated or uncontested.

### DISPOSITION

The order is affirmed.

_____
Dondero, Acting P. J.

We concur:

_____
Banke, J.

_____
Becton, J.[*]

_____

[*] Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.