Filed 7/14/22

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>LAURA MARIE SHELLY,<br><br>     Defendant and Appellant. | C094048<br><br>(Super. Ct. No. 19FE019828) |

APPEAL from a judgment of the Superior Court of Sacramento County, Richard K. Sueyoshi, Judge. Reversed in part and affirmed in part.

William G. Holzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Chung Mi Choi, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant Laura Marie Shelly pled no contest to one count of embezzlement by an employee. Pursuant to the negotiated plea, the trial court imposed a five-year term of felony probation. The court also ordered defendant to pay $72,972.47 in restitution. In this appeal, she argues the length of her probation must be reduced in light of Assembly Bill No. 1950 (2019-2020 Reg. Sess.) (Assembly Bill 1950), which reduced the maximum length of felony probation to two or three years. She also argues the amount of restitution must be reduced by $5,816.25.

We agree, and the People concede, that Assembly Bill 1950 applies retroactively and entitles defendant to have the length of her probation reduced. The question is whether the People are then entitled to withdraw from the plea agreement. As explained below, we hold they are not. We also reduce the restitution order by $1,000.[1]

### FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged with one count of embezzlement by an employee (Pen. Code, § 508) and one count of unlawful use of personal identification information (Pen. Code, § 530.5, subd. (a).)[2] In exchange for her plea of no contest to the embezzlement count, the prosecution agreed to dismiss the other count. As part of the plea agreement, she stipulated to the following factual basis: She was employed as a bookkeeper by Norwood Construction Services, and that in her role as an employee, she committed a felony by forging her boss's signature on several checks and cashing them for personal use.

On January 21, 2020, and per the parties' plea agreement, the court imposed a five-year term of felony probation, and 365 days in the county jail (alternative custody program) with one day of custody credit.

---

[1] This case was fully briefed and assigned to this panel on March 30, 2022.

[2] Further undesignated statutory references are to the Penal Code.

On May 3, 2021, following a restitution hearing, defendant was ordered to pay $72,972.47 to the victim.

Defendant filed a notice of appeal on May 6, 2021, challenging both the length of her probation and the amount of the restitution order.[3]  As noted above, she argues (1) the length of her probation must be reduced to three years in light of Assembly Bill 1950, and (2) the amount of restitution must be reduced by $5,816.25.

## DISCUSSION

### I

### *Assembly Bill 1950*

Assembly Bill 1950 (Stats. 2020, ch. 328) took effect on January 1, 2021.  It generally limits felony probation to a maximum of two years.  (§ 1203.1, subd. (a).) There is an exception for felony convictions for, among other things, section 503 (embezzlement) if the total value of the property taken exceeds $25,000, in which case probation is limited to a maximum of three years.[4]  (§ 1203.1, former subd. (m)(2).)

Defendant argues that Assembly Bill 1950 is retroactive and requires that her probation term be reduced to comply with its new limits.  The People agree.  Both parties also agree that, under Assembly Bill 1950, the maximum period of defendant's probation is now three years because she pled no contest to embezzlement by an employee and the total value of the property taken exceeded $25,000, as evidenced by the restitution order, which included over $27,000 in forged checks.

---

[3]    Although defendant did not obtain a certificate of probable cause, we agree she did not need one because she does not challenge the validity of her plea, but rather presents a postplea claim "seek[ing] relief because the law subsequently changed to [her] potential benefit."  (See *People v. Stamps* (2020) 9 Cal.5th 685, 698 (*Stamps*).)

[4]    There are other exceptions that are not applicable here.  (§ 1203.1, former subd. (m).)  Effective January 1, 2022, these exceptions have been renumbered to subdivision (l) of section 1203.1.  (Assem. Bill No. 177 (Reg. Sess. 2021-2022) Stats. 2021, ch. 257, § 22.)

Initially, we must determine whether Assembly Bill 1950 operates retroactively. We find that it does. All appellate courts that have considered the issue (including this one) have held that Assembly Bill 1950's new limit on probation is ameliorative and, therefore, applies retroactively to cases that are not yet final on appeal. (See *People v. Flores* (2022) 77 Cal.App.5th 420, 431-432 [listing cases], review granted June 22, 2022, S274561 (*Flores*); see also, e.g., *People v. Scarano* (2022) 74 Cal.App.5th 993, review granted June 1, 2022, S273830 (*Scarano*); *People v. Schulz* (2021) 66 Cal.App.5th 887; *People v. Lord* (2021) 64 Cal.App.5th 241; *People v. Sims* (2021) 59 Cal.App.5th 943 (*Sims*); *People v. Quinn* (2021) 59 Cal.App.5th 874 (*Quinn*); *People v. Stewart* (2021) 62 Cal.App.5th 1065, review granted June 30, 2021, cause transferred Apr. 20, 2022, S268787 (*Stewart*).)[5] Based on this unbroken line of authority, the parties agree that Assembly Bill 1950 applies retroactively, and we do too.

## II

### *Proper Remedy*

The main question raised by this appeal is: What is the proper remedy in light of the fact that defendant's sentence was imposed as part of a plea agreement? The answer

---

[5] On April 20, 2022, the Supreme Court transferred *Stewart* back to the Court of Appeal with directions to vacate the decision and reconsider the cause in light of Senate Bill No. 483 (2021-2022 Reg. Sess.), and ordered that the Court of Appeal decision "has no binding or precedential effect, and may be cited for potentially persuasive value only. (Cal. Rules of Court, rule 8.1115(e)(3)." That same day, the Supreme Court issued the same order in *People v. France* (2020) 58 Cal.App.5th 714, review granted February 24, 2021, cause transferred April 20, 2022, S266771 (*France*), and *People v. Andahl* (2021) 62 Cal.App.5th 203, review granted June 16, 2021, cause transferred April 20, 2022, S268336 (*Andahl*). Although we cite *Stewart*, *France*, and *Andahl* throughout this opinion, we do so for their persuasive value only. The issue in *Stewart* was whether the *Stamps* remedy applies to Assembly Bill 1950; *Stewart* held the answer is no. The issue in *France* and *Andahl* was whether the *Stamps* remedy applies to Senate Bill No. 136 (2019-2020 Reg. Sess.), which eliminated most prior prison term enhancements; both cases held the answer is no.

4

to this question has not generated the same unanimity as the question of whether Assembly Bill 1950 operates retroactively. At least two potential answers have emerged among California's appellate courts.

Three appellate courts have found that a defendant is entitled to have the length of his or her probation reduced to comply with Assembly Bill 1950's new limits—full stop. (*Stewart, supra*, 62 Cal.App.5th 1065; *People v. Butler* (2022) 75 Cal.App.5th 216, review granted June 1, 2022, S273773 (*Butler*); *Flores, supra*, 77 Cal.App.5th 420, rev. granted.)

Citing our Supreme Court's recent decision in *Stamps, supra*, 9 Cal.5th 685, two of our colleagues in *Scarano, supra*, 74 Cal.App.5th 993, review granted, recently held that although a defendant is entitled to have the length of his or her probation reduced, the People must then be given the opportunity to either accept the reduction or withdraw from the plea agreement and the trial court must be given the opportunity to withdraw its prior approval of the plea agreement. (*Scarano*, at pp. 1005-1006.) This remedy, i.e., allowing the People or the court to withdraw consent to a plea agreement when legislation subsequently ameliorates part of the agreed-upon sentence, is often referred to as the *Stamps* remedy or the *Stamps* remand procedure. In addition to finding the *Stamps* remedy is required, the *Scarano* court also held there is no sentencing cap if the People or the court withdraw their consent to the original plea agreement. (*Id.* at pp. 1014-1018.)

Defendant argues we must simply reduce the length of her probation to three years while leaving the rest of the plea agreement intact—which is the result reached in *Stewart*, *Butler*, and *Flores*. The People argue they must be given the opportunity to either accept the reduced probation term or withdraw from the plea agreement "if the reduced probation term is found to have deprived the People of the benefit of their bargain,"—which is similar, albeit not identical, to the result reached in *Scarano*. We agree with defendant and disagree with the People for two reasons. First, we find reducing defendant's probation term would not deprive the People of the benefit of their

5

bargain, and they are thus not entitled to withdraw from the plea agreement. Second, we find that *Stamps* is distinguishable and requiring the *Stamps* remedy here would undermine the Legislature's intent in enacting Assembly Bill 1950.

**A.      *Application of Assembly Bill 1950 Will Not Deprive the People of the Benefit of Their Bargain***

As noted above, the People contend they "must be allowed an opportunity to withdraw from the agreement *if the reduced probation term is found to have deprived the People of the benefit of their bargain*." (Italics added.) The italicized language comes largely from our Supreme Court's decision in *People v. Collins* (1978) 21 Cal.3d 208 (*Collins*). We find *Collins* is instructive.

The defendant in *Collins* was charged with 15 separate felony counts, including burglary, attempted burglary, forcible rape, assault with intent to commit rape, and forcible oral copulation. Pursuant to a plea bargain, he agreed to plead guilty to one count of oral copulation, and in return, the prosecutor agreed to strike the allegation that the crime was committed by means of force and to dismiss the 14 remaining counts. (*Collins, supra*, 21 Cal.3d at p. 211.) Prior to sentencing, the Legislature decriminalized nonforcible oral copulation, which was the only crime to which the defendant had pled guilty. The trial court nonetheless sentenced the defendant to state prison. The defendant appealed, arguing the trial court erred in imposing a sentence because the conduct to which he pled guilty was no longer punishable at the time of sentencing. (*Id.* at pp. 211-212.) Our Supreme Court agreed and reversed the conviction because "[a] conviction cannot stand on appeal when it rests upon conduct that is no longer sanctioned." (*Id.* at p. 213.)

As relevant here, the Supreme Court also held the People must be permitted to revive one or more of the dismissed counts because the change in law had deprived them of the benefit of the plea bargain. " 'The process of plea bargaining . . . contemplates an agreement negotiated by the People and the defendant and approved by the court. . . .

6

Pursuant to this procedure the defendant agrees to plead guilty in order to obtain a reciprocal benefit, generally consisting of a less severe punishment than that which could result if he were convicted of all offenses charged.' [¶] Critical to plea bargaining is the concept of reciprocal benefits. *When either the prosecution or the defendant is deprived of benefits for which it has bargained, corresponding relief will lie from concessions made.*" (*Collins, supra*, 21 Cal.3d at p. 214, italics added.) "*The question to be decided . . . is whether the prosecution has been deprived of the benefit of its bargain by the relief granted herein.* We conclude that it has and hence the dismissed counts may be restored. [¶] The state, in entering a plea bargain, generally contemplates a certain ultimate result; integral to its bargain is the defendant's vulnerability to a term of punishment. . . . [citation] . . . *When a defendant gains total relief from his vulnerability to sentence, the state is substantially deprived of the benefits for which it agreed to enter the bargain.* Whether the defendant formally seeks to withdraw his guilty plea or not is immaterial; *it is his escape from vulnerability to sentence that fundamentally alters the character of the bargain.* [¶] Defendant seeks to gain relief from the sentence imposed but otherwise leave the plea bargain intact. This is bounty in excess of that to which he is entitled. The intervening act of the Legislature in decriminalizing the conduct for which he was convicted justifies a reversal of defendant's conviction and a direction that his conduct may not support further criminal proceedings on that subject; but it also *destroys a fundamental assumption underlying the plea bargain—that defendant would be vulnerable to a term of imprisonment.* The state may therefore seek to reestablish defendant's vulnerability by reviving the counts dismissed." (*Collins, supra*, 21 Cal.3d at pp. 214-215, italics added.) In a more recent case, our Supreme Court explained that *Collins* involved a change in law that "eviscerated the judgment and the underlying plea bargain entirely." (*Harris v. Superior Court* (2016) 1 Cal.5th 984, 993.)

This case is factually different because it involves a change in law that reduces the length of probation rather than a change in law that decriminalizes certain conduct

entirely.  Nonetheless, we find persuasive the Supreme Court's framing of the issue as whether the change in law has deprived either party of the benefit for which it had bargained or has eviscerated the plea agreement entirely.  If the answer is yes, then *Collins* teaches that "corresponding relief will lie from concessions made."  (*Collins, supra*, 21 Cal.3d at p. 214.)  By implication, however, if the answer is no, then corresponding relief will not lie.

In exchange for defendant's plea of no contest to the embezzlement count, the People agreed to dismiss the other count and to a term of five years of probation with 365 days in jail.  To paraphrase *Collins*, a "fundamental assumption" underlying the parties' plea agreement was that defendant "would be vulnerable to a term of [probation]," and Assembly Bill 1950 has not destroyed that assumption.  (*Collins, supra*, 21 Cal.3d at p. 215.)  Defendant remains vulnerable to and will serve the maximum term of probation allowed by law, which is precisely what the People bargained for.  All of the conditions of probation imposed by the trial court remain in place.  Moreover, the 365-day jail term is unaffected by Assembly Bill 1950 and remains in place as well.  Defendant thus has not "gain[ed] total relief from [her] vulnerability to sentence," (*Collins*, at p. 215), and Assembly Bill 1950 has not "eviscerated the . . . underlying plea bargain entirely," (*Harris v. Superior Court, supra*, 1 Cal.5th at p. 993).  As a result, we find the People have not been substantially deprived of the benefit of the plea agreement, and under *Collins*, they are not entitled to withdraw from it.  (*Collins*, at p. 215.)

One other aspect of *Collins* deserves mention.  Although the Supreme Court held the prosecution was entitled to withdraw from the plea agreement, it held "the defendant is also entitled to the benefit of his bargain.  This is not a case in which the defendant has repudiated the bargain by attacking his guilty plea; he attacks only the judgment, and does so on the basis of external events—the repeal and reenactment of section 288a—that have rendered the judgment insupportable.  This court has long recognized that the state has no interest in preserving erroneous judgments [citation] . . . .  Here external events

8

and not defendant's repudiation undermined this plea bargaining agreement. Accordingly, we must fashion a remedy that restores to the state the benefits for which it bargained without depriving defendant of the bargain to which he remains entitled. [¶] This may best be effected by permitting the state to revive one or more of the dismissed counts, but limiting defendant's potential sentence" to that which the plea agreement had subjected him. (*Collins, supra*, 21 Cal.3d at p. 216, fn. omitted.) The court explained that limiting the defendant's potential sentence was "based on principles of double jeopardy," and was necessary in order "to preclude vindictiveness and more generally to avoid penalizing a defendant for pursuing a successful appeal." (*Ibid*.) "[A] defendant should not be penalized for properly invoking [his right] to overturn his erroneous conviction and sentence by being rendered vulnerable to punishment more severe than under his plea bargain." (*Id*. at p. 217.)

We find this holding is equally applicable here. Defendant has not repudiated the plea agreement by attacking her plea; instead, she attacks only the sentence imposed and she does so on the basis of external events—the enactment of Assembly Bill 1950—that have rendered the sentence insupportable. If the People decide three years of probation is insufficient and are permitted to withdraw from the plea agreement, the only other alternative becomes a period of incarceration longer than the agreed-upon 365 days. Such a result would run afoul of *Collins*. As *Collins* teaches, defendant should not be penalized for invoking her right to seek a probation term that complies with Assembly Bill 1950 by being rendered vulnerable to a punishment more severe than what the parties found acceptable under her plea agreement. We note that *Flores* reached a similar conclusion. (See *Flores, supra*, 77 Cal.App.5th at p. 451, rev. granted ["As a practical matter, given defendant's entitlement to the reduction of his probation term and the limitation in *Collins* precluding any punishment greater than that under the terms of the plea bargain, the options for restructuring a plea bargain in the context of a probation case would appear limited"].)

### B.        Stamps *is Distinguishable and the* Stamps *Remedy is Not Required*

Having found that the People have not been substantially deprived of the benefit of the plea agreement, we now turn to whether the remedy required in *Stamps* is required here. The People argue that it is, and that, as in *Stamps*, they must be allowed to either accept a reduction in defendant's probationary term or withdraw from the plea agreement. We find *Stamps* is distinguishable.

The defendant in *Stamps* was charged with three counts of first degree burglary and was alleged to have two prior serious felony convictions and three prior prison terms. Had the defendant been convicted on all counts and enhancements, he would have faced a sentence of 25 years to life. Pursuant to a plea agreement, he pled guilty to one of the burglary counts and admitted one serious felony conviction in exchange for a nine-year prison sentence based on the low term for burglary (two years) doubled under the Three Strikes law to four years, plus five years for the serious felony enhancement. All remaining counts and enhancements were dismissed as part of the plea agreement. (*Stamps, supra*, 9 Cal.5th at p. 693.)

While the defendant's appeal was pending, Senate Bill No. 1393 (2017-2018 Reg. Sess.) (Senate Bill 1393) took effect. Senate Bill 1393 amended section 1385 to permit trial courts to strike serious felony enhancements or the additional punishment for such enhancements in furtherance of justice. On appeal, the defendant argued Senate Bill 1393 should be applied retroactively, and his case should be remanded to the trial court to decide whether to strike the serious felony enhancement while leaving the remainder of the plea agreement intact. Our Supreme Court agreed Senate Bill 1393 applied retroactively and the case should be remanded to the trial court, but also held that remand could "have consequences to the plea agreement." (*Stamps, supra*, 9 Cal.5th at p. 707.) In particular, if the trial court struck the serious felony enhancement, then it was also entitled to withdraw its prior approval of the plea agreement, and the prosecutor was

10

entitled to withdraw from the plea agreement; in either event, the parties would be returned to the status quo ante. (*Id.* at pp. 707-708.)

The *Stamps* court found that such a remedy was required because the defendant was convicted pursuant to a plea agreement for a specific prison term, and "long-standing law" prohibits a court from unilaterally modifying the terms of a plea agreement without affording the aggrieved party (here, the prosecution) the opportunity to rescind it. (*Stamps, supra*, 9 Cal.5th at p. 701.) The *Stamps* court noted that section 1192.5 allows a plea agreement to "specify the punishment," (§ 1192.5, subd. (a)) and also provides, "When the plea is accepted by the prosecuting attorney . . . and is approved by the court, the defendant . . . cannot be sentenced on the plea to a punishment more severe than that specified in the plea and *the court may not proceed as to the plea other than as specified in the plea.*" (§ 1192.5, subd. (b), italics added.) Because the parties had agreed to and the court had approved a nine-year sentence, section 1192.5 prohibited the court from striking the five-year enhancement and unilaterally reducing the sentence to four years because doing so would be "proceed[ing] as to the plea other than as specified in the plea." While section 1385 was amended to allow a trial court to strike a serious felony enhancement, it did not amend or otherwise modify section 1192.5's prohibition on the court unilaterally modifying the terms of the plea agreement.

The *Stamps* court then held that, in order for the defendant to justify the remedy he sought (i.e., allowing the trial court to strike the enhancement while leaving the rest of the plea agreement intact), he "must establish . . . that, in enacting [Senate Bill 1393], the Legislature intended to overturn long-standing law that a court cannot unilaterally modify an agreed-upon term [of the plea agreement] by striking portions of it under section 1385." (*Stamps, supra*, 9 Cal.5th at p. 701.) The court concluded the Legislature had not intended such a result because neither the text of Senate Bill 1393 nor its legislative history mention plea agreements at all: "Nothing in the language and history of Senate Bill 1393 suggests an intent to modify section 1192.5's mandate that 'the court may not

11

proceed as to the plea other than as specified in the plea' without the consent of the parties. . . . That Senate Bill 1393 is silent regarding pleas and provides no express mechanism for relief undercuts any suggestion that the Legislature intended to create special rules for plea cases involving serious felony enhancements." (*Stamps*, at p. 704.)

As noted above, we find *Stamps* is distinguishable from this case. As *Stewart*, *Butler*, and *Flores* aptly note, the law at issue in *Stamps* (Senate Bill 1393) "gave the trial court discretion to strike an enhancement but did not require it to do so, thus placing directly in the trial court's hands the decision whether to alter a term of the plea bargain." (*Stewart, supra*, 62 Cal.App.5th at p. 1077; see also *Butler, supra*, 75 Cal.App.5th at p. 223, rev. granted ["*Stamps* was only concerned with a discretionary law"]; *Flores, supra*, 77 Cal.App.5th at p. 449, rev. granted ["Reduction in the maximum probation term under Assembly Bill 1950, which was effected by the Legislature directly and does not rely upon the trial court's exercise of its sentencing discretion, is distinguishable"].) Senate Bill 1393 thus directly implicated the rule that the *Stamps* court was concerned with—namely, that "*the court* may not proceed as to the plea other than as specified in the plea" (§1192.5, subd. (b), italics added) or unilaterally alter the terms of a plea agreement by modifying an agreed-upon sentence. (*Stamps, supra*, 9 Cal.5th at p. 700.) Indeed, the *Stamps* case is replete with references to the rule against *the court* unilaterally modifying a term in a plea agreement. (*Id.* at p. 700 ["section 1385 ordinarily does not authorize *a trial court* to exercise its discretion to strike in contravention of a plea bargain for a specified term" (italics added)]; *id.* at p. 701 [noting there is "no authority . . . allowing *a trial court* to breach the bargaining by striking the prior to impose less than the 32 months agreed upon" (italics added)]; *id.* at p. 701 ["long-standing law limits *the court's* unilateral authority to strike an enhancement yet maintain other provisions of the plea bargain" (italics added)]; *id.* at p. 701 [citing "long-standing law that *a court* cannot unilaterally modify an agreed-upon term" in a plea agreement (italics added)]; *id.* at p. 702 [citing "existing law regarding *a court's* lack of authority to unilaterally modify a

12

plea agreement" (italics added)]; *id.* at p. 702 ["*a court* lacks discretion to modify a plea agreement unless the parties agree to the modification" (italics added)].)

In contrast to Senate Bill 1393, Assembly Bill 1950 does not give the trial court discretion about whether to modify an agreed-upon term of a plea agreement by reducing the length of probation. Instead, it "directly affect[s]" plea agreements by rendering probation longer than two or three years "invalid." (*Stewart, supra*, 62 Cal.App.5th at p. 1077; see also *Butler, supra*, 75 Cal.App.5th at p. 223, rev. granted [Assem. Bill 1950 "directly invalidate[d] the term of a plea bargain"].) Assembly Bill 1950 now provides that probation for the crime to which defendant agreed to plead shall not exceed three years. (§ 1203.1, former subd. (m)(2).) Reducing defendant's probation to three years would not implicate the rule that *the court* may not unilaterally modify the length of an agreed-upon sentence, because it is *the Legislature* that has effectively reduced the length of defendant's probation term. Our conclusion that it is the Legislature rather than the court that has reduced defendant's probation also implicates the rule announced by our Supreme Court in *Doe v. Harris* (2013) 57 Cal.4th 64, that plea agreements are deemed to incorporate the power of the state to change the law. As the *Stewart* court explained: "As stated in *Doe v. Harris* (2013) 57 Cal.4th 64, 70 (*Doe*), 'the Legislature, for the public good and in furtherance of public policy, and subject to the limitations imposed by the federal and state Constitutions, has the authority to modify or invalidate the terms of an agreement.' '[T]he general rule in California is that the plea agreement will be " 'deemed to incorporate and contemplate not only the existing law but the reserve power of the state to amend the law or enact additional laws for the public good and in pursuance of public policy. . . .' " (*People v. Gipson* (2004) 117 Cal.App.4th 1065, 1070.) That the parties enter into a plea agreement thus does not have the effect of insulating them from changes in the law that the Legislature has intended to apply to them.' (*Doe*, at p. 66.)" (*Stewart, supra*, 62 Cal.App.5th at p. 1077.) "Under *Doe*, it matters very much whether a court makes a discretionary change in a plea bargain (as in

13

*Stamps*) or the Legislature makes a change in the law that necessarily affects the bargain (as here)." (*Id.* at p. 1078; see also *Butler*, at p. 224; *Andahl, supra*, 62 Cal.App.5th at pp. 212-213.) We agree.

We also agree with those courts that have found reducing defendant's probation to comply with Assembly Bill 1950's limits does not run afoul of, or even implicate, the rule at issue in *Stamps*. (See *Stewart, supra*, 62 Cal.App.5th at p. 1077 ["*Stamps* . . . had no occasion to consider the effect on a plea bargain of retroactive application of a law through which the Legislature directly affected a plea bargain by rendering one of its terms invalid. Where the ameliorative change in law is mandatory, the question is not whether the Legislature intended to allow the trial court to alter the terms of a plea bargain but whether the Legislature intended to, in effect, do so directly"]; *Butler, supra*, 75 Cal.App.5th at p. 223, rev. granted ["*Stamps* was only concerned with a discretionary law and thus had no reason to consider the difference between discretionary laws and laws that directly invalidate the term of a plea bargain"]; *Flores, supra*, 77 Cal.App.5th at p. 448, rev. granted ["The remedy in *Stamps* served to reconcile the defendant's entitlement to request the trial court exercise its newly expanded sentencing discretion under Senate Bill 1393 with the trial court's lack of authority to modify a term of the parties' plea bargain"]; *Scarano, supra*, 74 Cal.App.5th at p. 1019, rev. granted (dis. opn. of Raye, J.) ["The power at issue is not the unilateral power of a court to modify a plea agreement but the power of a court to determine that the agreement has been superseded by the Legislature's intent as expressed in a particular legislative enactment"].)

When it enacted Assembly Bill 1950, the Legislature exercised its reserve power to amend the law by limiting felony probation to two or three years. Moreover, we find that the Legislature intended for that amendment to modify the plea agreement in this

14

case and cases like it.[6]  The legislative history of Assembly Bill 1950 shows it was enacted to address the Legislature's concern that " '[p]robation—originally meant to reduce recidivism—has instead become a pipeline for re-entry into the carceral system.' " (Assem. Floor Analysis, 3d reading analysis of Assem. Bill 1950 (2019-2020 Reg. Sess.), as amended May 21, 2020, p. 1.)  The Legislature wanted to stop that pipeline and keep people from being incarcerated.  According to the bill's author, " 'California's adult supervised probation population is around 548,000—the largest of any state in the nation, more than twice the size of the state's prison population, almost four times larger than its jail population and about six times larger than its parole population.  [¶]  'A 2018 Justice Center of the Council of State Governments study [citation] found that a large portion of people violate probation and end up incarcerated as a result.  The study revealed that 20% of prison admissions in California are the result of supervised probation violations, accounting for the estimated $2 billion spent annually by the state to incarcerate people for supervision violations.  Eight percent of people incarcerated in a California prison are behind bars for supervised probation violations.  Most violations are "technical" and minor in nature, such as missing a drug rehab appointment or socializing with a friend who has a criminal record.  [¶] . . . [¶]  'Research [citation] by the California Budget & Policy Center shows that probation services . . . are most effective during the first 18 months of supervision. . . .  A shorter term of probation . . . should lead to improved outcomes for . . . people on . . . probation while reducing the number of people . . . returning to incarceration.' "  (*Ibid.*)

---

**6**     It is in this way that we part with the holding in *Scarano* wherein that court "conclude[d] that the trial court's sentencing discretion and discretion to withdraw its consent from a plea agreement (*unless limited by the Legislature*) are separate reasons for applying the *Stamps* remedy." (*Scarano, supra*, 74 Cal.App.5th at p. 1007, rev. granted, italics added.)  We find here that the Legislature has indeed limited the trial court's discretion to withdraw from the plea agreement.

15

Based on this legislative history, we agree with those courts that have found Assembly Bill 1950 was enacted, in large part, to "ensure that many probationers avoid imprisonment." (*Sims, supra*, 59 Cal.App.5th at p. 962.) In the words of one court: "There is no dispute that the longer a probationer remains on probation, the more likely it is he or she will be found to be in violation of a probation condition. There also is no dispute that the longer a probationer remains on probation, the more likely it is he or she will be sentenced to prison for a probation violation. Assembly Bill No. 1950 does not guarantee that a probationer will abide by his or her probation conditions and, as a result, avoid imprisonment. However, by limiting the duration of felony probation terms, Assembly Bill No. 1950 ensures that at least some probationers who otherwise would have been imprisoned for probation violations will remain violation free and avoid incarceration." (*Id*. at p. 960; see also *Quinn, supra*, 59 Cal.App.5th at p. 879 ["The legislative history reflects that the Legislature's concern was that lengthy probationary periods do not serve a rehabilitative function and unfairly lead to reincarceration for technical violations"]; *Stewart, supra*, 62 Cal.App.5th at p. 1078 [Legislature shortened length of probation in order to reduce potential for probationers to be incarcerated for probation violations].)

When interpreting legislation, "a court must adopt the construction most consistent with the apparent legislative intent and most likely to promote rather than defeat the legislative purpose and to avoid absurd consequences." (*In re J.W.* (2002) 29 Cal.4th 200, 213.) Here, allowing the People or the court to withdraw from the plea agreement would defeat rather than promote the Legislature's purpose in enacting Assembly Bill 1950. As the *Butler* court recognized, and as we noted above, if the prosecutor (or the court) does not agree to Assembly Bill 1950's reduced probation term, the only alternative is incarceration. (See *Butler, supra*, 75 Cal.App.5th at p. 225, rev. granted.) As we also noted above, one of the Legislature's primary goals in enacting Assembly Bill 1950 was to "ensure that many probationers avoid imprisonment." (*Sims, supra*,

16

59 Cal.App.5th at p. 962.) Given this, we decline to adopt an interpretation that would require a defendant to risk imprisonment in order to take advantage of Assembly Bill 1950's reduction in the length of probation. (Accord *Stewart, supra*, 62 Cal.App.5th at p. 1078 ["allowing the prosecution to withdraw from plea deals involving probation terms of more than two years would undermine the Legislature's intent to reduce the number of probationers subject to conditions of probation and risk of incarceration for periods the Legislature deemed unnecessary and deleterious"]; *Butler*, at p. 225 ["if the People were to renegotiate [the] plea on remand, with the only option being prison time, this would frustrate the intent of the Legislature to reduce incarceration for people subject to probation"]; *Flores, supra*, 77 Cal.App.5th at p. 450, rev. granted ["the People's suggested remedy places defendant in the untenable position of potentially being both deprived of the benefit of the change in the law to which he is entitled *and* deprived of the benefit of his bargain"]; *Andahl, supra*, 62 Cal.App.5th at p. 213 ["If we authorize the people to withdraw from the plea agreement and the trial court to withdraw its prior approval, this remedy may result in a defendant, paradoxically, facing a harsher sentence than he did before he asserted his rights"].)

More generally, requiring a *Stamps* remand would also be at odds with the *Estrada* presumption that ameliorative criminal statutes apply retroactively to all cases to which they constitutionally could apply. In *Estrada* our Supreme Court held: "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final. This intent seems obvious, because to hold otherwise

17

would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology." (*In re Estrada* (1965) 63 Cal.2d 740, 745.)

To paraphrase another panel of this court, "it is undisputed that [Assembly Bill 1950] applies retroactively under *Estrada* and requires the elimination of [probationary terms over two or three years]. If we authorize the People to withdraw from the plea agreement and the trial court to withdraw its prior approval, this remedy may result in the defendant, paradoxically, facing a harsher sentence than he did before he asserted his rights under *Estrada*. (*Estrada*, at p. 745.) Such a result cannot be squared with the *Estrada* directive that a 'lighter penalty' should be imposed whenever 'it constitutionally could apply.' (*Ibid*.) For these reasons, we conclude the retroactive application of [Assembly Bill 1950] under *Estrada* binds the people to a unilateral change in defendant's sentence." (*Andahl, supra*, 62 Cal.App.5th at p. 213.) We agree.

As numerous courts have recognized, the "vast majority" of criminal cases are resolved through plea agreements. (*In re Chavez* (2003) 30 Cal.4th 643, 654, fn. 5 ["In fiscal year 2000-2001, of the total number of felony dispositions consisting of felony convictions, less than 5 percent followed a trial by the court or by a jury, and of the total number of felony dispositions consisting of reductions to misdemeanor convictions, less than 3 percent followed court or jury trial"]; see also *In re Alvernaz* (1992) 2 Cal.4th 924, 933 ["Commentators have estimated that in most jurisdictions, between 80 and 90 percent of criminal cases are disposed of by guilty pleas [citation], which, in the majority of cases, are the product of plea bargains"]; *People v. Mejia* (2019) 36 Cal.App.5th 859, 866 [" 'a substantial portion—probably the vast majority—of criminal cases are disposed of through the process of plea bargaining' "]; *Amin v. Superior Court* (2015) 237 Cal.App.4th 1392, 1410 [plea bargaining is "the process by which the vast majority of criminal cases are adjudicated in this day and age"].) Holding that Assembly Bill 1950 does not apply to plea agreements—which represent the vast majority of judgments that

18

are not yet final—would effectively turn the *Estrada* presumption on its head. We thus agree with *Flores* that, "[g]iven that the majority of all criminal cases are resolved by plea, applying Assembly Bill 1950 only in a minority subset of cases would frustrate the Legislature's intent to advance specific social and financial public policy goals through the reduction of probation terms, and it would do so in most cases." (*Flores, supra*, 77 Cal.App.5th at p. 446, rev. granted; see also *France, supra*, 58 Cal.App.5th at p. 730 ["In essence, then, the People . . . would create a rule that defendants who plead guilty may benefit from the retroactive operation of any law whose retroactivity depends on the *Estrada* presumption only if the prosecution assents. Such an approach would drastically undermine the *Estrada* principle that the Legislature intends a lighter penalty to apply 'to every case to which it constitutionally could apply' (*Estrada*, at p. 745), particularly as defendants who plead guilty represent the vast majority of convictions [citation]. We see no indication in *Stamps* that the Supreme Court intended such a result"].)

The People also discuss legislative intent. They focus on the following statement in *Stamps*: "In order to justify a remand for the court to consider striking his serious felony enhancement while maintaining the remainder of his bargain, defendant must establish not only that Senate Bill 1393 applies retroactively, but that, in enacting that provision, the Legislature intended to overturn long-standing law that a court cannot unilaterally modify an agreed-upon term by striking portions of it under section 1385." (*Stamps, supra*, 9 Cal.5th at p. 701.) The *Stamps* court then found the defendant failed to meet his burden because neither the text nor the legislative history of Senate Bill 1393 expressly mention plea agreements: "That Senate Bill 1393 is silent regarding pleas and provides no express mechanism for relief undercuts any suggestion that the Legislature intended to create special rules for plea cases involving serious felony enhancements." (*Stamps*, at p. 704.) From these two statements in *Stamps*, the People would create a rule that ameliorative legislation may be applied retroactively to plea bargained sentences

19

*only* if legislative intent to do so is *express*, and they note (accurately) that Assembly Bill 1950 (like Senate Bill 1393) does not expressly mention plea agreements.

We disagree, for two reasons. First, and as *Stewart* and *Butler* found, "*Stamps* should not be read as holding retroactive ameliorative legislation may be applied to plea bargained sentences only if legislative intent for it to do so is *express*. . . . '*Stamps* did not hold that such express provisions are necessary for a retroactive legislative amendment to authorize a trial court to strike an agreed-upon enhancement while holding the parties to the remaining terms of the plea agreement,' only that 'the absence of such provisions "undercuts" the notion that the Legislature intended to affect the otherwise applicable and long-standing bar on a trial court's ability to unilaterally modify plea-bargained sentences.' " (*Stewart, supra*, 62 Cal.App.5th at pp. 1078-1079, fn. omitted, quoting *France, supra*, 58 Cal.App.5th at pp. 727-728; see also *Butler, supra*, 75 Cal.App.5th at p. 224, rev. granted [it is a "misread[ing]" of *Stamps* to "requir[e] an explicit statement of application to plea agreements"].) Second, and more importantly, the *Stamps* court was talking about evidence that the Legislature intended to overturn the rule that a court cannot unilaterally modify a plea agreement. As we have discussed above, however, we find that rule is not applicable in this case because it is the Legislature, not the court, that has unilaterally modified the plea agreement by rendering one of its terms invalid. And because that rule is not applicable, there is no need for evidence that the Legislature intended to overturn it.[7]

---

[7] One final note. The People argue that, even if they are not permitted to withdraw from the plea agreement, we should still remand this case to the trial court so that it may determine the status of probation and adjust or modify probation terms so they can be complied with before probation terminates. Although defendant agrees in her reply that "a limited remand for these purposes is appropriate," we are not convinced it is necessary because the trial court already "has the authority at any time during the term of probation to revoke, modify, or change" its order, (§ 1203.3, subd. (a)), and "[n]othing herein precludes defendant from moving the trial court to modify the conditions of her probation

20

# III

## The Restitution Order

Defendant also argues the restitution order should be reduced by $5,816.25. As explained below, we agree, but only in part, and reduce the restitution order by $1,000.

Crime victims have a constitutional right to restitution for losses resulting from criminal acts against them. (Cal. Const., art. I, § 28, subd. (b)(13).) The Legislature has enacted section 1202.4 to implement this constitutional right. Section 1202.4 provides, "in every case in a which a victim has suffered economic losses as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim . . . based on the amount of loss claimed by the victim . . . or any other showing to the court." (§ 1202.4, subd. (f).) "To the extent possible, the restitution order . . . shall be of a dollar amount that is sufficient to fully reimburse the victim . . . for every determined economic loss incurred as the result of the defendant's criminal conduct." (*Id*., subd. (f)(3).)

A defendant has a right to a hearing "to dispute the determination of the amount of restitution." (§ 1202.4, subd. (f)(1).) "The standard of proof at a restitution hearing is preponderance of the evidence, not reasonable doubt." (*People v. Holmberg* (2011) 195 Cal.App.4th 1310, 1319.) "Section 1202.4 does not, by its terms, require any particular kind of proof. However, the trial court is entitled to consider the probation report, and, as prima facie evidence of loss, may accept a property owner's statement made in the probation report about the" loss. (*People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1542-1543.) Prima facie evidence of loss may also be based on the victim's

---

in light of the reduced term of probation," (*Quinn, supra*, 59 Cal.App.5th at p. 885, fn. 6). The People also argue we should remand this case in order to allow defendant to apply for expungement under section 1203.4, subdivision (a). Again, however, we need not order a remand for this purpose because section 1203.4 already gives defendant the right to apply for such relief and nothing herein precludes her from doing so.

testimony.  (*People v. Millard* (2009) 175 Cal.App.4th 7, 26.)  "Once the victim makes a prima facie showing of economic losses incurred as a result of the defendant's criminal acts, the burden shifts to the defendant to disprove the amount of the losses claimed by the victim."  (*Gemelli*, at p. 1543; see also *People v. Keichler* (2005) 129 Cal.App.4th 1039, 1048 [" 'When the probation report includes information on the amount of the victim's loss and a recommendation as to the amount of restitution, the defendant must come forward with contrary information to challenge that amount' "].)  "A restitution order is reviewed for abuse of discretion and will not be reversed unless it is arbitrary or capricious.  [Citation.]  No abuse of discretion will be found where there is a rational and factual basis for the amount of restitution ordered."  (*Gemelli*, at p. 1542.)

Here, the victim of defendant's embezzlement was Brian Norwood, the owner of Norwood Construction Services and defendant's former employer.  The trial court adopted the probation department's recommendation that restitution be ordered in the amount of $72,972.47, broken down as follows:

| | |
|---|---|
| Forged checks: | $27,836.17 |
| Unauthorized electronic debits or wire transfers: | $2,693.80 |
| Bookkeepers' time to investigate: | $7,442.50 |
| Norwood's time: | $35,000.00 |

As noted above, the trial court was entitled to rely on the probation report as prima facie evidence of Norwood's loss.  (*People v. Gemelli, supra*, 161 Cal.App.4th at p. 1543; *People v. Keichler, supra*, 129 Cal.App.4th at p. 1048.)

Defendant argues that $1,000 was erroneously included in the unauthorized wire transfers amount, and that the bookkeepers' time is too high and must be reduced to the "accurate" amount of $2,626.25.

### A.     *The $1,000 Wire Transfer*

One of the unauthorized wire transfers was for $1,000.  Defendant argues this amount should *not* be included in the restitution award because the money was

transferred from one of Norwood's bank accounts to another, and he thus did not experience a loss.**8**

To support her argument, defendant points to a document introduced at the restitution hearing (exhibit No. 4) captioned "Account Activity Transaction Details" that memorializes the challenged transfer. Norwood testified he obtained this document from his bank (Bank of America). It appears to show a $1,000 withdrawal was made from Norwood's "Business Advantage Ch[ec]k[ing]" account on July 11, 2019. The "Description" of the transfer includes the following:**9** "WIRE TYPE: WIRE OUT DATE: 190711" and "BNF:BRIAN NORWOOD" and "BNF BK:ZIONS BANCO." The "Merchant name" is "BRIAN NORWOOD." At the restitution hearing, Norwood testified on direct examination that he was "not sure where" the $1,000 went, that he did not initiate or authorize the transfer, and that defendant "was wiring from my accounts to who knows who; friends or herself or whatever." On cross examination he testified, "Zions Bank is the parent company for California Bank and Trust. We were concerned that [defendant] was stealing money out of California Bank and Trust where I have lines of credit." He also gave the following testimony about the Account Activity Transaction Details document:

"Q    And I want to talk to you about Exhibit 4 which is the wire transfers.

"A    Exhibit 4? I'm sorry?

"Q    Exhibit 4, yes. The first page is a wire transfer to Zions Bank Co. and you mentioned that is one of your own accounts; is that correct?

"A    Zions Bank is the parent company for California Bank and Trust.

---

**8**    She acknowledges the transfer was not authorized.

**9**    We do not quote the entire description because we cannot tell whether it contains confidential information about Norwood's bank account(s).

23

"Q      Okay.  So this wire transfer left your business checking account ending in [XXXX] and was deposited into your line of credit account?

"A      That's what it looks like.

"Q      And the merchant name listed there is actually Brian Norwood, correct?

"A      Right."

Norwood's testimony establishes that the $1,000 at issue was apparently transferred from one of his accounts (his business checking account with Bank of America) to another (a line of credit he had with Zions Bank/California Bank and Trust), and that he thus did not suffer a loss in this amount.  This evidence established that the People did not meet their burden in regard to this transfer and the trial court abused its discretion in awarding it.

### B.      The Bookkeepers' Time

The restitution order includes $7,442.50 for bookkeeping work performed by two of Norwood's employees—Jill Brooks and John Fruge—to investigate and identify defendant's embezzlement.  Defendant acknowledges their work was properly included in the order, but she argues Norwood's testimony demonstrates the amount awarded is too high and must be reduced to $2,626.26.

According to the probation recommendation, "The investigative cost for two of [Norwood's] employees totaled $7,442.50 for a total of 114.5 hours of work."  Mathematically, this works out to an average of $65 per hour.  The 114.5 hours comes from statements by Brooks and Fruge that Norwood provided to the probation department and that were also introduced at the restitution hearing.  According to the statements, Brooks spent 94.5 hours and Fruge spent 20 hours on this case through February 2020.

At the restitution hearing, Norwood was asked how much Brooks was paid, and he testified, "I got to tell you I don't remember.  I want to say it was 50 or 60,000 a year and

24

then divide a normal 2000 hour or 2080[10] and then you come up with an hourly rate." On cross-examination, he was shown a document that was not admitted into evidence, and was then asked the following question:

"Q      Do you see a column there that says hourly wage for Jill Brooks?

"A      The 22.50.  Um-hum."

Norwood also testified Fruge made "probably . . . 50,000 plus or minus annually. So his hourly wage would be something close to 25 an hour."

Defendant argues this evidence establishes that (1) Brooks worked 94.5 hours and was paid $22.50 per hour for a total of $2,126.25, and (2) Fruge worked 20 hours and was paid $25.00 per hour for a total of $500.  She thus argues the bookkeeping portion of the award should be reduced from $7,442.50 to $2,626.25.  Although this is a colorable argument, defendant fails to convince us that the trial court abused its discretion in awarding the $7,442.50 claimed by Norwood in the probation report.  Regarding the 20 hours noted on Fruge's statement, Norwood testified it ended up being "a lot more than that" because Fruge did work after the statement was prepared and submitted to the probation department.  Moreover, Norwood's testimony that Brooks and Fruge were "probably" paid "something close to" $22.50 or $25 an hour is too equivocal to establish their actual hourly rate.  Because the evidence on this issue is equivocal, we find the trial court was justified in relying on the amount listed in the probation report.  (See *People v. Baker* (2005) 126 Cal.App.4th 463, 469 [if evidence reasonably supports trial court's finding re restitution, judgment may not be overturned if evidence "might also reasonably support a contrary finding."].)

---

**10**      I.e., hours worked per year based on a 40-hour workweek, and either 50 or 52 weeks per year.

## DISPOSITION

In accordance with Assembly Bill 1950, defendant's five-year probation term is reduced to three years.  The restitution order is also reduced by $1,000 to $71,972.47.  The trial court is directed to amend its records to reflect these two modifications.  The judgment is otherwise affirmed.

                                                                     /s/
                                                               EARL, J.

We concur:

/s/
ROBIE, Acting P. J.

/s/
MAURO, J.